**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **INOVA HEALTH CARE SERVICES, FOR INOVA FAIRFAX HOSPITAL AND ITS DEPARTMENT, LIFE WITH CANCER, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 20-784 (JDB)** |
| **OMNI SHOREHAM CORP.,** | |
| **Defendant.** | |

**MEMORANDUM OPINION**

This case arises from a contract between plaintiffs—Inova Health Care Services, for Inova Fairfax Hospital and its Department, Life with Cancer ("Inova") and Smith Center for Healing and the Arts ("Smith Center")—and defendant Omni Shoreham Corporation ("Omni"). The parties agreed that plaintiffs would hold an annual fundraising gala at the Omni Shoreham Hotel ("Hotel") on September 21, 2019. Each side alleges that the other breached that contract—plaintiffs assert that Omni breached by relocating the event to different locations in the Hotel, and Omni claims that Inova breached by refusing to pay liquidated damages after cancelling the gala at the Hotel. Both parties now seek summary judgment. See generally Omni's Mem. of L. Supporting Its Mot. for Summ. J. [ECF No. 62-1] ("Omni MSJ"); Mem. in Supp. of Inova's Mot. for Summ. J. [ECF No. 63-1] ("Inova MSJ"). For the following reasons, the Court will deny both motions for summary judgment.

## Background

### I.  Factual Background

Inova Health Care Services is a nonprofit healthcare provider that operates many hospitals, including Inova Fairfax Hospital and a department of that hospital, "Life with Cancer." Pl.'s Statement of Material Facts as to Which There Is No Genuine Dispute [ECF No. 63-2] ("Inova SUMF") ¶ 1.  In 2008, Robert Hisaoka created the "Joan Hisaoka 'Make a Difference' Gala" ("Gala"), an annual charity event, to "raise money to support organizations, including Inova." Id. ¶ 2; see Omni's Statement of Undisputed Facts Supporting Omni MSJ [ECF No. 62-2] ("Omni SUMF") ¶ 1.  The Gala is a "black-tie event" that includes "a formal dinner, silent and live auctions, and dancing," as well as other programs.  Omni SUMF ¶ 1; see Inova SUMF ¶ 4.  Inova's "Life With Cancer department has been a beneficiary of the Gala every year since 2010."  Inova SUMF ¶ 3.  Plaintiffs assert that Smith Center was a beneficiary of the Gala, id. ¶ 109; see Omni SUMF ¶ 5, though the parties dispute whether Omni was aware of this fact, see Omni SUMF ¶¶ 14, 34–35.

Beginning in 2013, and every year thereafter until 2018, the Gala was held at the Hotel. Omni SUMF ¶ 2.  The Gala is organized by Hisaoka through his company RGH Management Services, LLC ("RGH").  Id. ¶ 3; see Inova SUMF ¶ 6.  Each year, Hisaoka signs a written fundraising agreement with Inova, which provides that the cost of the Gala is to be paid from donations received in connection with the Gala, after which Inova (and other beneficiaries) receive allocations of the donations.  Inova SUMF ¶ 6; Omni SUMF ¶¶ 5–6; see Fundraising Agreement – 2019 [ECF No. 62-3] ("Inova-RGH 2019 Agreement")[1] at 5.  The Inova-RGH 2019 Agreement

---

[1] The 2019 agreement between RGH and Inova, Smith Center, and other beneficiaries of the 2019 Gala is appended as Exhibit 6 to Omni's excerpts from Hisaoka's deposition.  The Court will cite this agreement using the document's internal pagination.

also gave Hisaoka and RGH "full authority and responsibility for planning, organizing and implementing the [Gala]," including the right and responsibility to enter into "contracts and agreements associated with the [Gala] . . . on behalf of, and as agent for," the beneficiaries.  Inova-RGH 2019 Agreement at 1.  That fundraising agreement for the 2019 Gala was signed by Sage Bolte, then the Executive Director of Inova's "Life With Cancer" department, on December 18, 2018.  Omni SUMF ¶¶ 7–8; Inova-RGH 2019 Agreement at 8.

On December 14, 2018, Hisaoka—acting as "Event Chair/Authorized Agent" for "Inova Health Care Services for Inova Fairfax Hospital and its department, Life with Cancer, as beneficiary of the 2019 Joan Hisaoka Make a Difference Gala"—signed a "Letter of Agreement" with Omni, providing that the Hotel would host the 2019 Gala on September 21, 2019.  First Am. Compl. Ex. A [ECF No. 26] ("Agreement") at 1–2, 6[2]; see Inova SUMF ¶ 46; Omni SUMF ¶¶ 10, 15.[3]  The "Event Details" section of the Agreement lists the Gala's reserved locations as the "Ambassador Ballroom" for a "Cocktail Reception" and "Dessert Reception," and the "Regency Ballroom" for a "Gala Dinner."  Agreement at 2; Omni SUMF ¶ 16; Inova SUMF ¶ 47.  The "expected attendance" for the Cocktail Reception and Dinner is listed as "400"; the parties agreed to "a catering minimum of $70,000.00 in catered food and beverage purchases" and that Omni would "be notified of the exact attendance no later than" noon on September 18, 2019.  Agreement at 2; see Inova SUMF ¶ 75 n.18.

---

[2] The Agreement and other exhibits are appended in the same document as Inova's First Amended Complaint. The Court will refer to pages from the exhibits according to their internal pagination.

[3] The parties dispute whether Hisaoka or his company RGH entered the Letter of Agreement.  Compare Inova SUMF ¶ 46, with Omni SUMF ¶ 10.  See also Pl.'s Statement of Facts as to Which There Is Genuine Dispute [ECF No. 65-2] ("Inova SDF") ¶ 2 (disputing Omni's statement that "RGH entered" the Agreement and instead asserting that "Robert Hisaoka as Event Chair and Authorized Agent of Inova" entered it).  The Court will address this dispute below in Section I.

Inova agreed to pay "[a] non-refundable deposit of $10,000.00 . . . to secure the above outlined arrangements," which would be used against the total cost; if the Gala was "cancelled for reasons other than a default hereunder by the Hotel . . . , this deposit w[ould] be applied toward any liquidated damages due."  Agreement at 3; Inova SUMF ¶ 53; see Omni SUMF ¶ 33; Inova SDF ¶ 7 (disputing whether the $10,000 deposit was required to secure the reservation "at the Hotel" or "to secure the Ambassador and Regency Ballrooms").  Under the "Cancellation" section, the Agreement provides that if Inova cancelled the Gala "between June 23, 2019 and July 22, 2019," it would pay "$29,000.00" "as liquidated damages and not as a penalty."  Agreement at 3; see Inova SUMF ¶ 55.  Finally, under the section "Changes, Additions, Stipulations, or Lining Out," the parties agreed that "[a]ny changes, additions, stipulations, or decisions . . . w[ould] not be considered agreed to or binding unless such modifications [were] initialed or otherwise approved in writing by both parties."  Agreement at 6; see Inova SUMF ¶ 57; see also Omni's Statement of Material Facts in Dispute, in Opp'n to Inova MSJ [ECF No. 64-1] ("Omni SDF") ¶ 57 (disputing Inova's assertion that this provision prevented the Hotel from unilaterally reassigning the event spaces).  The Agreement was signed on December 14, 2018 by Hisaoka on behalf of Inova and countersigned by Michael Schneider, "Director of Catering & Convention Services," and Michael Murgas, "Director of Sales," on Omni's behalf.  Agreement at 6.

On July 8, 2019, an Omni employee informed Hisaoka by email that the Hotel had relocated, or was planning to relocate, the Gala from the Ambassador and Regency Ballrooms to alternative spaces at the Hotel (the Roberts Restaurant and the Blue Room).  Omni SUMF ¶ 38; Inova SUMF ¶ 80; see Inova SDF ¶ 10 (indicating that the parties dispute whether the July 8 email informed plaintiffs that Omni "had relocated" or "was planning to relocate" the Gala).  By a letter dated July 9, 2019, plaintiffs' counsel responded to that email and demanded that Omni reverse its

decision to relocate the Gala.  Omni SUMF ¶ 42; Inova SUMF ¶¶ 85–86; see First Am. Compl. Ex. C [ECF No. 26] ("July 9 Letter") at 2 ("Please consider this letter a demand for an immediate rescission of [the July 8] e-mail . . . .  In the event the Hotel fails to rescind the e-mail in writing by 5:00 p.m. tomorrow[,] . . . our client intends to immediately seek all legal and equitable remedies available . . . .").  Omni declined to rescind its reassignment decision, Omni SUMF ¶ 43; Inova SUMF ¶ 87; see First Am. Compl. Ex. D [ECF No. 26] ("July 11 Email") at 1 ("The Hotel stands by its offer to hold the [Gala] in the [alternative spaces identified in the July 8 email,] . . . and the Hotel remains ready and willing . . . to host the Gala in this alternative space . . . . [W]e hope [plaintiffs] will reconsider the Hotel's offer.").

Plaintiffs' counsel responded by letter on July 12, 2019, informing Omni that plaintiffs would not hold the Gala at the Hotel.  Omni SUMF ¶ 45; Inova SUMF ¶ 104; see Inova SDF ¶ 12 (disputing whether plaintiffs refused to hold the Gala at the Hotel, or whether they refused to hold the Gala in the reassigned spaces within the Hotel); First Am. Compl. Ex. E [ECF No. 26] ("July 12 Letter") at 3 ("[The July 11 email] only confirms further unequivocally and positively that the Hotel has repudiated the terms and conditions of the Agreement . . . .  Accordingly, please be advised that our client has decided against holding the [Gala] at the Hotel and, instead, will file suit against the Hotel and seek all remedies that are available under the Agreement and at law . . . .").  Plaintiffs also "demanded" that Omni return the $10,000 deposit via check issued by Smith Center.  Omni SUMF ¶ 55; Inova SUMF ¶ 107; see Inova SDF ¶ 14 (disputing Omni's characterization of the letter); July 12 Letter at 3 ("[G]iven the Hotel's default and breach of the Agreement, [plaintiffs] hereby demand that . . . the Hotel return to [plaintiffs] the $10,000 deposit made by us . . . .").  Omni agreed to return the deposit and issued a check to Smith Center.  Omni

SUMF ¶¶ 56–57 (asserting that Omni refunded the "non-refundable" deposit "[i]n the interest of trying to maintain a good business relationship with [plaintiffs]"); Inova SUMF ¶ 107.

Inova ultimately held its 2019 Gala at the Mandarin Oriental Hotel on September 21, 2019. Omni SUMF ¶ 54; Inova SUMF ¶ 109.  And, pursuant to a contract signed by Omni on July 8, 2019, Omni hosted an event for the Embassy of Lebanon in the Regency and Ambassador Ballrooms of the Hotel "from September 19, 2019, through September 22, 2019."  Omni SUMF ¶ 37; Inova SUMF ¶ 103; see Omni MSJ Ex. 6 [ECF No. 62-8] ("Embassy Agreement") at 1–8[4] (Letter of Agreement between Embassy of Lebanon and Omni for an event from "9/19/2019 – 9/22/2019").

## II.    Procedural History

In March 2020, plaintiffs filed suit against Omni in D.C. Superior Court, alleging that Omni breached the Agreement and the implied covenant of good faith and fair dealing.  See Compl. [ECF No. 1-3] ¶¶ 36–40, 42–44.[5]  Omni removed the case to this Court, see Notice of Removal [ECF No. 1] at 1, answered the complaint, see generally Answer [ECF No. 4], and moved to dismiss Smith Center and another (now-dismissed) plaintiff, see generally Omni's Mot. to Dismiss Pls. Smith Center & Special Love [ECF No. 3]; Stipulation of Dismissal [ECF No. 61] at 1.  The Court denied Omni's motion.  See Mem. Op., July 22, 2020 [ECF No. 13], at 19.  Plaintiffs filed an amended complaint, see generally First Am. Compl., which Omni moved to dismiss in part, see Mot. to Dismiss [ECF No. 29] at 1 (seeking to dismiss, inter alia, plaintiffs' claims for breach of

---

[4] The Embassy Agreement is attached as an exhibit in the same document as the transcript of Susan E. Darrow's deposition.  The Court will cite the Embassy Agreement using its internal pagination.

[5] Plaintiffs also filed suit against "John Doe Organization"—the entity with which Omni contracted to host a different event in the Ambassador and Regency Ballrooms on September 19, 2021—for tortious interference with contractual relations.  Compl. ¶¶ 5, 16–17, 46–49.  Additionally, plaintiffs claimed that Omni and John Doe Organization engaged in a "civil conspiracy."  Id. ¶¶ 51–53.  "John Doe Organization," later identified as the Embassy of Lebanon, was dismissed from this suit in July 2021.  See Notice of Dismissal [ECF No. 60] at 1.

contract and breach of the covenant of good faith and fair dealing).  The Court denied Omni's motion, Mem. Op. & Order, Apr. 14, 2021 [ECF No. 41] at 13–14, and Omni answered the amended complaint, this time asserting a counterclaim against Inova for breach of contract, Omni's Ans. to First Am. Compl. & Countercl. Against Pl. Inova [ECF No. 46] ("Countercl.") ¶¶ 20–33.[6] Inova moved to dismiss Omni's counterclaim, see generally Pl.'s Mot. to Dismiss Def. Omni's Countercl. [ECF No. 50], and the Court denied that motion, see Mem. Op., Mar. 22, 2022 [ECF No. 72] at 12.  After all the dust has settled, the claims remaining in this litigation are (1) plaintiffs' claim against Omni for breach of contract, (2) plaintiffs' claim against Omni for breach of the covenant of good faith and fair dealing, and (3) Omni's claim against Inova for breach of contract.

Both parties now move for summary judgment on all claims.  The cross-motions are fully briefed and ripe for this Court's decision.  See generally Omni's Mem. of L. in Opp'n to Inova MSJ [ECF No. 64] ("Omni Opp'n"); Pls.' Opp'n to Omni MSJ [ECF No. 65] ("Inova Opp'n"); Omni's Mem. in Reply to Inova Opp'n [ECF No. 66] ("Omni Reply"); Reply to Omni Opp'n [ECF No. 67] ("Inova Reply").

## Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[D]isputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  But summary judgment may not "be avoided based on just any disagreement as to the relevant facts; the dispute must be 'genuine,' meaning that there must be sufficient

---

[6] Omni's answer and counterclaim are contained in the same filing, with the counterclaim beginning on page 18; the paragraphs in the counterclaim restart at paragraph 1.  The Court will cite the counterclaim by its own paragraph numbers.

admissible evidence for a reasonable trier of fact to find for the non-movant." Etokie v. Duncan, 202 F. Supp. 3d 139, 146 (D.D.C. 2016) (quoting Anderson, 477 U.S. at 248)).  Thus, a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251–52.

To support its factual positions, a party must "cit[e] . . . particular parts of materials in the record" or "show[] that the  materials cited" by the opposing party "do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1).  "Courts must avoid making 'credibility determinations or weigh[ing] the evidence'" and should accept the non-movant's evidence as true and make all justifiable inferences in its favor.  Perry-Anderson v. Howard Univ. Hosp., 192 F. Supp. 3d 136, 143 (D.D.C. 2016) (alteration in original) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).  This is so because "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,' and are thus inappropriate at summary judgment."  United States v. $17,900.00 in U.S. Currency, 859 F.3d 1085, 1092 (D.C. Cir. 2017) (alteration in original) (quoting Anderson, 477 U.S. at 255).  Thus, "[i]f material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences," a court should not grant summary judgment.  Hagan v. United States, 275 F. Supp. 3d 252, 257 (D.D.C. 2017).

"When . . . both parties file cross-motions for summary judgment, each must carry its own burden under the applicable standard."  United States ex rel. Morsell v. Symantec Corp., 471 F. Supp. 3d 257, 276 (D.D.C. 2020) (quoting Ehrman v. United States, 429 F. Supp. 2d 61, 67 (D.D.C. 2006)).  The court then reviews the motions separately to determine whether either party is entitled to summary judgment, analyzing facts and making inferences in the light most favorable to the

non-moving party.  See id.  "If the Court determines that one party is not entitled to summary judgment, it changes tack on the cross motion and gives the unsuccessful movant all of the favorable factual inferences that it has just given to the movant's opponent."  Id. at 276–77 (quoting Trudel v. SunTrust Bank, 288 F. Supp. 3d 239, 245 (D.D.C. 2018)).  "It is nonetheless still possible for a court to deny summary judgment to both sides."  Trudel, 288 F. Supp. 3d at 245.

## Analysis

### I.  Standing

Omni first contends that both Smith Center and Inova lack standing to assert claims against Omni.  Omni MSJ at 11, 14.  Article III of the U.S. Constitution establishes an "'irreducible constitutional minimum of standing' consist[ing] of three familiar elements."  Farrell v. Blinken, 4 F.4th 124, 129 (D.C. Cir. 2021) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)).  A plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016).  Because a "defect of standing is a defect in subject matter jurisdiction," Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987), a court "must dismiss the action" if it "determines at any time that it lacks subject-matter jurisdiction," Fed. R. Civ. P. 12(h)(3); see also Maynard v. Architect of the Capitol, 544 F. Supp. 3d 64, 70 n.3 (D.D.C. 2021) ("[T]he defendant is permitted to bring its motion seeking dismissal for lack of subject-matter jurisdiction at any time.").  The elements of standing are "an indispensable part of the plaintiff's case," and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the same manner and degree of evidence required at the successive stages of the litigation."  Lujan, 504 U.S. at 561.  Thus, at summary judgment, a "plaintiff can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit

or other evidence 'specific facts'" supporting its standing, "which for purposes of the summary judgment motion will be taken as true." Id. (citation omitted).

In addition to Article III standing, "[c]ourts have developed 'prudential standing' rules, which act as self-imposed limits on the jurisdiction of Article III courts." Amgen, Inc. v. Scully, 234 F. Supp. 2d 9, 16 (D.D.C. 2002). Two such limitations are that (1) a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties," Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 474 (1982) (quoting Warth v. Seldin, 422 U.S. 490, 499 (1992)); and (2) "the plaintiff's complaint fall[s] within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question,'" id. at 475 (quoting Ass'n of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 153 (1970)).

## A. Smith Center

Although the Court previously denied Omni's motion to dismiss Smith Center for lack of standing, Omni now argues—with the benefit of a full evidentiary record—that Smith Center lacks standing and must be dismissed. Omni MSJ at 11–14. Omni asserts that plaintiffs cannot prove Omni had any reason to believe that Smith Center was a third-party beneficiary and, "[a]s a stranger to the Agreement," Smith Center both lacks prudential standing and has not suffered an injury sufficient to confer Article III standing. Id. Plaintiffs respond that Smith Center's status as a beneficiary was clear to Omni because of Smith Center's "long-term participation in the Gala" and its payment of certain expenses related to the 2019 Gala in particular. Inova Opp'n at 7–9. For the same reasons, plaintiffs assert that Smith Center suffered an injury because of Omni's alleged breach of contract, "or, at a minimum, that that material fact is in genuine dispute." Id. at 9–10.

"In order to sue for damages on a contract claim, a plaintiff must have either direct privity or third party beneficiary status." Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp., 944 A.2d 1055, 1064 (D.C. 2008) (citation omitted).  "Third-party beneficiary status requires that the contracting parties had an express or implied intention to benefit directly the party claiming such status." Id. (citation omitted).  "The agreement itself is the best evidence of the parties' intent," Wash. Tennis & Educ. Found., Inc. v. Clark Nexsen, Inc., 270 F. Supp. 3d 158, 165 (D.D.C. 2017), but because the parties' intent may be either express or implied, "the absence of the third party's name from the contract is not fatal to his claim, especially when the surrounding circumstances tend to identify the third-party beneficiary," W. Union Tel. Co. v. Massman Constr. Co., 402 A.2d 1275, 1277 (D.C. 1979); see Kelleher v. Dream Catcher, LLC, 278 F. Supp. 3d 221, 224 (D.D.C. 2017) (noting that a third-party beneficiary's "identity must be ascertainable from either the terms of the contract or the circumstances surrounding its creation").

Omni argues that the Agreement "on its face" shows that the only contracting parties are Omni and Inova, Omni MSJ at 11, and that it "had no reason to know of Smith Center's possible interest in the [2019] Agreement," id. at 13 (cleaned up).[7]  Plaintiffs do not dispute that Smith Center was not a party to the Agreement but argue instead that Omni was on sufficient notice at the time of contracting that Smith Center was an intended beneficiary.  See Inova Opp'n at 7–9. Plaintiffs first note that Smith Center issued a $10,000 check to Omni to secure the reservation of the event spaces.  Omni SUMF ¶¶ 33–34; see Inova Opp'n Ex. B [ECF No. 65-4] ("Hisaoka Aff. & Exs.") at 51 (image of check).  Additionally, after the parties' communications about reassignment and cancellation, Omni returned that deposit by issuing a check for $10,000, which

---

[7] Omni also points out that a section of the Agreement entitled "Changes, Additions, Stipulations, or Lining Out" provides that any changes to the Agreement by either Inova "as beneficiary" (singular) of the 2019 Gala must be initialed by both parties.  Omni MSJ at 16 n.9; see Agreement at 6.  Because the Court must examine not only the face of the Agreement, but also the surrounding circumstances, this point is not dispositive.

was issued to, received by, and deposited by Smith Center.  Omni SUMF ¶¶ 57–58; Omni MSJ Ex. 2 [ECF No. 62-4] ("Hisaoka Dep. Tr.") at 38:6–14.  Second, plaintiffs point to Smith Center's "long-term participation in the Gala"—by paying both the $10,000 deposit and the entire balance for Galas from 2013 to 2015 and from 2017 to 2018—as evidence that Omni was "on sufficient notice that the [Agreement] was for the benefit of Smith Center."  Inova Opp'n at 7 (citation omitted) (cleaned up); see Hisaoka Aff. & Exs. ¶ 9 (explaining that past years' contracts "required that Omni be provided a D.C. tax exemption form," and Smith Center furnished the form because it, unlike Inova, is a D.C. "non-profit entity"), ¶¶ 10–19 (listing Smith Center's past payments to Omni for past years' Galas); see also id. at 10 (September 2014 "Abbreviated Direct Bill Application," completed by Hisaoka as "Agent for Smith Center," authorizing Omni to bill Smith Center), 11–38 (billing statements and checks issued by Smith Center to Omni for past years' Galas).

Plaintiffs also point to a deposition of Omni's former Senior Catering Manager, Dominic Sanchez, who testified that "Smith Center was one of the beneficiaries of every Gala in which . . . Sanchez participated at the Hotel" from 2013 to 2015.  Inova Opp'n at 7–8; see Inova Opp'n Ex. D [ECF No. 65-6] ("Sanchez Dep. Tr.") at 39:13–21.  Sanchez drafted the contract for the 2013 Gala.  Sanchez Dep. Tr. at 38:13–24.  He testified that Smith Center submitted the "DC tax exemption form" in 2013, id. at 38:13–39:12, and that he "absolutely" understood Smith Center to be a beneficiary in 2013 and all following years, id. at 39:16–21.  In sum, plaintiffs argue, "Omni's purported ignorance of Smith Center cannot be squared with th[e] undisputed facts," so it would be "inappropriate" to conclude that Smith Center lacks standing.  Inova Opp'n at 9.

Although standing is not addressed in Omni's reply, see Omni Reply at 1 n.1, Omni asserts in its rebuttal to plaintiffs' statement of disputed facts that Omni "had no knowledge of why Smith

12

Center was paying the deposit on RGH's or Inova's behalf." Omni's Statement in Rebuttal to Inova SDF [ECF No. 66-1] ("Omni Facts Reply") ¶ 35.[8] Omni points to the deposition testimony of its corporate representative, Mark Roche-Garland, who testified that Smith Center was not "noted in any correspondence" concerning the 2019 Gala, Omni MSJ Ex. 7 [ECF No. 62-9] ("Roche-Garland Dep. Tr.") at 202:2–7; that "Omni has no knowledge" of Smith Center's payment for past events, id. at 202:17–203:2; and that "Omni has no knowledge as to" the identity of the party who signed the $10,000 check for the 2019 Gala deposit, id. at 203:9–18. Roche-Garland also testified that, although Sanchez might have been aware of Smith Center's beneficiary status, see id. at 202:8–14, "Omni has no knowledge of that," id. at 202:8–203:2 (emphasis added).

The question, then, is whether there is sufficient evidence to conclude that Omni was aware of Smith Center's status as a third-party beneficiary at the time the parties entered the Agreement. Plaintiffs point to Piedmont Resolution, LLC v. Johnston, Rivlin & Foley, 999 F. Supp. 34 (D.D.C. 1998), where the court concluded that a plaintiff was a third-party beneficiary to a contract, even though its name did not appear on the contract and the opposing party claimed it "had no knowledge" of the alleged beneficiary, in part because the party's name appeared in "wire transfer instructions that allegedly were to be 'glued' to" the contract, 999 F. Supp. at 48–49. The Court agrees with plaintiffs that there is sufficient evidence of Smith Center's involvement in the Agreement such that a reasonable finder of fact could conclude that Omni had reason to know Smith Center was a third-party beneficiary. Like the surrounding circumstances in Piedmont

---

[8] Omni also contends that plaintiffs are "improperly relying on inadmissible parol evidence pertaining to negotiations between the parties for agreements in prior years, well before the Agreement was executed in December 14, 2018." Omni Facts Reply ¶ 35 (citing Ozerol v. Howard Univ., 545 A.2d 638, 641 (D.C. 1988), remanded in part on other grounds, 555 A.2d 1033 (D.C. 1989)). Omni's assertion about parol evidence is misguided in this context because courts considering whether an entity is a third-party beneficiary consider both the contract and the "surrounding circumstances" of its formation to determine the parties' intent. See W. Union Tel. Co., 402 A.2d at 1277.

Resolution, Smith Center's payment of the $10,000 balance for the 2019 Gala, its similar payments in past years, and the fact that the events received tax-exempt status through Smith Center's involvement, were enough to put Omni on notice of Smith Center's role.  Accordingly, the Court concludes that Smith Center has sufficiently established both its prudential standing as a third-party beneficiary, see Fort Lincoln Civic Ass'n, 944 A.2d at 1064, and its Article III standing because Omni's alleged breach of the Agreement impaired Smith Center's interest in the performance of the Agreement, see Mem. Op., July 22, 2020, at 9–10 (explaining that if Smith Center were a third-party beneficiary, it would have "a legally protected interest in having Omni . . . perform its duties under the" Agreement).

### B.  Inova

Omni next asserts that Inova lacks standing because Robert Hisaoka or his company RGH entered the Agreement without Inova's authority.  Omni MSJ at 14–18.  Plaintiffs respond that Hisaoka had authority to enter the Agreement as Inova's agent, Inova Opp'n at 10, 12, 15–16; that, in any event, Inova later ratified the contract, id. at 16; and that Omni is bound by its own judicial admissions that a valid contract exists between Omni and Inova, id. at 10–13.  Because Inova later ratified the Agreement—regardless of Hisaoka's then-existing authority to enter the Agreement on Inova's behalf—the Court concludes that Inova has standing to continue this suit.

"[R]atification is a form of retroactive activity that occurs where a principal, having knowledge of the material facts, accepts the benefits of the agent's actions already made on his behalf." Dentons US LLP v. Republic of Guinea, 410 F. Supp. 3d 194, 212 (D.D.C. 2019) (citation omitted); see also Restatement (Third) of Agency § 4.01(2) (Am. L. Inst. 2006) (explaining that a party "ratifies an act by (a) manifesting assent that the act shall affect the [party]'s legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents").  Thus, "[i]f a

party with actual authority ratifies a prior act, 'the legal consequence is that the principal's legal relations are affected as they would have been had the' initial act been taken 'with actual authority at the time of the act.'" Dentons, 410 F. Supp. 3d at 212 (cleaned up) (quoting GDG Acquisitions LLC v. Gov't of Belize, 849 F.3d 1299, 1308 (11th Cir. 2017)).

The thrust of Omni's argument is that Inova executed an agreement with RGH and Hisaoka (as well as Smith Center and other beneficiaries)—whereby Inova agreed that Hisaoka or RGH could act as its agent—only after Hisaoka signed the Agreement with Omni. Omni MSJ at 16–17. Compare Inova-RGH 2019 Agreement at 8 (reflecting that Hisaoka signed the document on December 14, 2018 and Sage Bolte, then-Executive Director of Inova's Life With Cancer group, signed on December 18, 2018), with Agreement at 1, 6 (reflecting that both Hisaoka, as Inova's "Authorized Agent," and Omni's Director of Catering and Director of Sales signed the Agreement on December 14, 2018). Hence, according to Omni, Hisaoka had no legal authority to take any legally binding action on Inova's behalf, so Inova is not truly a party to the 2019 Agreement. See Omni MSJ at 16–17.

But plaintiffs contend that "it is beyond genuine dispute that Inova subsequently ratified Mr. Hisaoka's act of executing the [Inova–Omni] Gala Contract by Dr. Bolte's execution of the [Hisaoka/RGH–Inova] Fundraising Agreement four days later, and that ratification, as a matter of law, relates back to and provides original authorization for Mr. Hisaoka's prior execution of" the Agreement with Omni. Inova Opp'n at 16. Omni does not respond to this argument, and the Court agrees with plaintiffs that, by later signing a document allowing Hisaoka to act as its authorized agent with respect to the 2019 Gala, Inova ratified the Agreement on December 18, 2018. See Dentons, 410 F. Supp. 3d at 212. Accordingly, Inova has standing to proceed as a party to the allegedly breached Agreement between plaintiffs and Omni.

## II.    Rescission

Omni next argues that plaintiffs' claims "fail as a matter of law because the undisputed facts show that Plaintiffs and Omni voluntarily rescinded the Agreement in July 2019."   Omni MSJ at 19.  According to Omni, plaintiffs' July 12, 2019 letter informing Omni that plaintiffs were cancelling the Gala "was 'an unqualified refusal . . . to perform,'" id. at 21 (citation omitted), and plaintiffs' acceptance of Omni's refund of the $10,000 deposit check further evidenced plaintiffs' consent to rescission, returning the parties "to their respective positions prior to entering into the Agreement," id.  Plaintiffs vigorously dispute Omni's assertion, arguing that it was Omni who refused to perform under the terms of the Agreement (by refusing to hold the Gala in the Ambassador and Regency Ballrooms), Inova Opp'n at 18, and that the fact that plaintiffs cashed Omni's $10,000 check returning their deposit is irrelevant because there is no evidence suggesting that "Omni represented that it was offering the . . . check to Inova as rescission . . . , or that [plaintiffs] understood that" to be Omni's intent, id. at 19–20.

"[A] finding of rescission must rest upon the existence of an unqualified refusal to perform the contractual obligations."  Clark v. Clark, 535 A.2d 872, 880 (D.C. 1987); see also Cooper v. Cooper, 35 A.2d 921, 924 (D.C. 1944) ("The act upon which the person bases his right to no longer be bound by a contract must involve an unqualified refusal by the other party to perform, and should, in its legal effect, amount to a determination not to be bound by, or perform the contract in the future." (citation omitted)).  An agreement "can be rescinded by mutual consent of the parties, and an agreement to rescind may be evidenced by the conduct of the parties as well as by an express agreement."  Clark, 535 A.2d at 880.  Hence, "[i]f one party, even wrongfully, expresses a wish or an intention to cease performance and the other party fails to object, circumstances may justify the inference that there has been an agreement of rescission."  Restatement (Second) of

Contracts § 283 cmt. a (Am. L. Inst. 1981); accord Rodenberg v. Dezendorf, 66 A.2d 210, 211 (D.C. 1949).

To assess whether the parties mutually agreed to rescind the Agreement, the Court will briefly reiterate its summary of the parties' communications leading up to the cancellation of the 2019 Gala at the Hotel.  On July 8, 2019, an Omni employee informed Hisaoka by email that the Hotel was relocating the Gala from the Ambassador and Regency Ballrooms to alternative spaces at the Hotel.  Omni SUMF ¶ 38; Inova SUMF ¶ 80.  By a letter dated July 9, 2019, plaintiffs' counsel responded to that email and demanded that Omni reverse its decision to reassign the Gala; counsel stated that plaintiffs would otherwise "immediately seek all legal and equitable remedies." July 9 Letter at 2; see Omni SUMF ¶ 42; Inova SUMF ¶¶ 85–86.  Omni declined to rescind its reassignment decision but stated that it "remain[ed] ready and willing . . . to hold the Gala" in the alternative spaces.  July 11 Email at 1; see Omni SUMF ¶ 43; Inova SUMF ¶ 87.  Plaintiffs' counsel responded on July 12, 2019, explaining that plaintiffs "ha[d] decided against holding the [Gala] at the Hotel and, instead, w[ould] file suit against the Hotel and seek all remedies that are available."  July 12 Letter at 3; see Omni SUMF ¶ 45; Inova SUMF ¶ 104; Inova SDF ¶ 12. Plaintiffs also "demand[ed]" that Omni return the $10,000 deposit paid by a check issued by Smith Center.  July 12 Letter at 3; see Omni SUMF ¶ 55; Inova SUMF ¶ 107; Inova SDF ¶ 14.  Omni agreed to return the deposit and issued a check to Smith Center.  Omni SUMF ¶¶ 56–57 (stating that Omni refunded the "non-refundable" deposit "[i]n the interest of trying to maintain a good business relationship with [plaintiffs]"); Inova SUMF ¶ 107.

Omni points to a series of cases where courts have concluded that a contracting party has elected the remedy of rescission by accepting and cashing the counter-party's refund check.  Omni MSJ at 20 (collecting cases); see First Penn-Pac. Life Ins. Co. v. Evans, 313 F. App'x 633, 637

(4th Cir. 2009) (per curiam) (applying Maryland law and explaining that "[o]ften when an insured cashes a premium refund check offered as a rescission, this action manifests agreement and effectuates the rescission"); Rideau v. Great-West Life & Annuity Ins. Co., 981 F. Supp. 2d 544, 549 (E.D. La. 2013) (applying Louisiana law and explaining that "the act of negotiating a refund check after notice of cancellation at least raises an inference of mutual rescission"). According to Omni, Inova manifested its assent to rescind the Agreement by demanding and accepting the $10,000 check refunding its "non-refundable" deposit. Omni MSJ at 21.

But in the cases on which Omni relies, the courts explained that mutual rescission occurs only when the parties "clearly indicate[] their mutual understanding that the contract is abrogated." First Penn-Pac. Life Ins. Co., 313 F. App'x at 637 (emphasis added) (citation omitted); see Rideau, 981 F. Supp. 2d at 549 ("When an insurer mails a letter to an insured stating its intent to rescind and tenders a check to the insured representing a refund . . . , and the insured understands the intent to rescind when cashing the check, a meeting of the minds is deemed to have occurred . . . ." (citation omitted)). Thus, as plaintiffs assert, "[t]he mere fact that an insured cashes or retains a refund check is not by itself sufficient to constitute rescission as a matter of law." Inova Opp'n at 19 (quoting Mut. of Omaha Ins. Co. v. Korengold, 241 N.W.2d 651, 652 (Minn. 1976) (per curiam)). In Korengold, for example, the court concluded that the insured's acceptance of a refund check constituted acceptance of rescission because the letter accompanying the check "made clear that the [insurer] was seeking a rescission of the policy," so the insured cashed the check "with full knowledge of [the insurer]'s contentions." 241 N.W.2d at 652.

The same is not true here. Omni has not shown that either party acted with the intent to rescind the Agreement, or knew that issuing and depositing the check would function as such. Omni contends that, by requesting the refund of its non-refundable deposit, plaintiffs elected the

remedy of rescission and thus cannot seek other remedies.  But plaintiffs expressed a belief that Omni had breached the Agreement, and an intent to "file suit . . . and seek all remedies that are available."  July 12 Letter at 3.  Further, Omni has presented no evidence that it informed plaintiffs that Omni was issuing the check in an effort to seek rescission:  indeed, Omni's corporate representative testified that Omni chose to return the check "[w]hether . . . at Inova's demand or our acquiescence," "voluntarily" and because "it was good business" practice based on Omni's relationship with Hisaoka.  Roche-Garland Dep. Tr. at 183:22–184:19; see also Omni MSJ Ex. 8 [ECF No. 62-10] ("Yienger Dep. Tr.") at 252:10–253:6 (testifying that Omni returned the deposit because Hisaoka was a "repeat client," so Omni "felt that the right thing to do since he no longer wanted to host the event at the hotel, was to give him his money back"), 257:5–10 (explaining that Omni returned the deposit "[a]s a show of good faith and goodwill to a repeat customer, in the event that [Omni] c[ould] have a future conversation about the [Gala] returning").  Thus, the Court concludes that there was no "mutual consent of the parties" to rescind the Agreement, Clark, 535 A.2d at 880, and accordingly rejects Omni's assertion that the Agreement was rescinded.

## III.   Breach of Contract

Turning to the heart of this matter, the Court will now address the parties' competing claims for breach of contract.  See First Am. Compl. ¶¶ 40–44; Countercl. ¶¶ 20–33.  Plaintiffs allege that Omni breached the Agreement "[b]y refusing to make available for the 2019 Gala the Hotel's Ambassador Ballroom and Regency Ballroom," First Am. Compl. ¶ 43; Omni counters that Inova[9] breached the Agreement by cancelling the Gala and failing to "tender the agreed-upon sum of $29,000.00 in liquidated damages to Omni," Countercl. ¶¶ 25–28.  Both parties seek summary judgment on these competing contract claims.

---

[9] Omni's counterclaim is asserted only against Inova, not against Smith Center.  See Countercl. ¶ 3.

To state a claim for breach of contract under District of Columbia law, "a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." Zaccari v. Apprio, Inc., 390 F. Supp. 3d 103, 108 (D.D.C. 2019) (quoting Francis v. Rehman, 110 A.3d 615, 620 (D.C. 2015)).   As explained above in rejecting Omni's standing arguments, the Court has already concluded that the Agreement is a valid and enforceable contract between the parties. See Omni MSJ at 24; Inova MSJ at 12.  Because both parties have satisfied the first element of their claims, the Court will turn to addressing the remaining elements.

"The District of Columbia applies the objective theory of contracts, meaning that 'the language of the agreement as it is written governs the obligations of the parties unless that language is unclear . . . ." Kriesch v. Vilsak, 931 F. Supp. 2d 238, 253 (D.D.C. 2013) (quoting Simon v. Circle Assocs., Inc., 753 A.3d 1006, 1012 (D.C. 2000)).  "The writing must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms, and ascertaining the meaning in light of all the circumstances surrounding the parties at the time the contract was made." Carlyle Inv. Mgmt., LLC v. Ace Am. Ins. Co., 131 A.3d 886, 895 (D.C. 2016) (citation omitted).  Whether a contract is ambiguous is a legal question to be determined by a court. Wharf, Inc. v. Dist. of Columbia, 133 F. Supp. 3d 29, 41 (D.D.C. 2015).  If a court concludes "that the contract has more than one reasonable interpretation and therefore is ambiguous, then the court— after admitting probative extrinsic evidence—must determine what a reasonable person in the position of the parties would have thought the disputed language meant." Dyer v. Bilaal, 983 A.2d 349, 355 (D.C. 2009) (citation omitted).

Summary judgment is appropriate if a contract is unambiguous because "absent . . . ambiguity, a written contract duly signed and executed speaks for itself and binds the

parties without the necessity of extrinsic evidence." Holland v. Hannan, 456 A.2d 807, 815 (D.C. 1983).  Even if a contract is ambiguous, "summary judgment may still be appropriate 'so long as there is no evidence that would support a conflicting interpretation of the agreement,'" Partridge v. Am. Hosp. Mgmt. Co., 289 F. Supp. 3d 1, 21 (D.D.C. 2017) (quoting Am. First Inv. Corp. v. Goland, 925 F.2d 1518, 1522 (D.C. Cir. 1991)), but courts "generally will not grant summary judgment where a contract is ambiguous because its interpretation inevitably would depend . . . on a choice between reasonable inferences to be drawn from extrinsic evidence," Potomac Elec. Power Co. v. Mirant Corp., 251 F. Supp. 2d 144, 149 (D.D.C. 2003) (cleaned up) (quoting Holland, 456 A.2d at 815).

### A.  Plaintiffs' Claim Against Omni

Plaintiffs allege that, under the Agreement, Omni "had an obligation or duty" to "make available for the 2019 Gala[] . . . the Hotel's Ambassador Ballroom . . . [and] the Hotel's Regency Ballroom, as specified in the Gala Contract."  First Am. Compl. ¶ 42.  By refusing to host the Gala in those spaces, Omni "breached its duties under the" Agreement, id. ¶ 43, and plaintiffs thereby "suffered damages, including a reduction in their share of donations received in connection with the 2019 Gala caused by increased Gala costs, attorney's fees incurred negotiating vendor agreements and agreements with other hotels, and decreased Gala revenue resulting from the need to relocate the Gala to a different hotel," id. ¶ 44.  Omni responds that the Agreement "does not contain any express prohibition against reassigning event spaces," which is a "standard practice in the hotel industry," so Omni's relocation of the Gala was not a breach.  Omni MSJ at 25–31.  And even if the Agreement did bar the reassignment of event spaces, Omni asserts that any breach "was not material to the Agreement," and therefore did not relieve plaintiffs of their duty to conduct the Gala at the Hotel, id. at 31–35.

Plaintiffs assert that, by its terms, the Agreement required Omni to host the Gala in the Regency and Ambassador Ballrooms, First Am. Compl. ¶ 42, and that the parties intentionally negotiated a contract which would prevent any relocation of event space during their pre-2019 dealings, see Inova Opp'n at 23–25.  Omni responds that the Agreement does not expressly prohibit event space reassignment, which is a common industry practice.  See Omni MSJ at 25. Neither party, then, asserts that the Agreement is clear on the issue of room reassignment; both rely on some form of extrinsic evidence to interpret it.  See Omni MSJ at 25–31 (relying on evidence of industry practice to argue that reassignment was permitted); Inova Opp'n at 23–25 (relying on evidence of past negotiations and agreements between Inova and Omni to argue that reassignment was forbidden).[10]  The Court concludes that the Agreement is ambiguous on the question of reassignment and will look to the parties' proffered extrinsic evidence to determine whether the Agreement allowed Omni unilaterally to reassign spaces for the 2019 Gala.

And after considering that contradictory extrinsic evidence, the Court concludes that neither party has established an entitlement to summary judgment on plaintiffs' claim that Omni breached the Agreement by reassigning the Gala to different rooms.  See Potomac Elec. Power

---

[10] In reply, Omni asserts that mere silence on a particular question is not enough to generate ambiguity.  Omni Reply at 11–13 (citing Cason v. Nat'l Football League Players Ass'n, 538 F. Supp. 3d 100, 118 (D.D.C. 2021)).  The Court notes that Omni's arguments are arguably conflicting: it argues that the Court should consider extrinsic evidence of industry practice, see Omni MSJ at 26–27, but also contends that the Agreement is unambiguous, see Omni Reply at 12–13.  Regardless, the Court concludes that the Agreement is ambiguous on the question of reassignment.

Omni also criticizes plaintiffs' reliance on "inadmissible parol evidence" of the negotiations of past years' iterations of the Agreement to add a negative covenant—barring reassignment of rooms—to the Agreement, which is a fully integrated contract.  See Omni Reply at 13–15 & n.6 (cleaned up).  This is in contrast, Omni asserts, to evidence of standard industry practice, which may "aid the court in understanding the basic, unstated assumptions of parties contracting within a particular field."  Id. at 15–16 (quoting Thorn EMI N. Am. v. Hyundai Elec. Indus. Co., No. 94-332-RRM, 1996 WL 33415780, at *7 (D. Del. July 12, 1996)).  Particularly given its finding that the Agreement is ambiguous on this point, the Court declines Omni's invitation to consider some extrinsic evidence—of the alleged standard hotel industry practice of reassigning event spaces—while rejecting other extrinsic evidence—of the parties' past contract negotiations—when construing the same contract.  See Potomac Elec. Power Co., 251 F. Supp. 2d at 149 (explaining that a court construing an ambiguous contract "may consider . . . the circumstances before and contemporaneous with the making of the contract, all habitual and customary practices which either party knows or has reason to know, the circumstances surrounding the transaction, and the course of conduct of the parties to the contract" (citing Waverly Taylor, Inc. v. Polinger, 583 A.2d 179, 182 (D.C. 1990))).

Co., 251 F. Supp. 2d at 150.  On Omni's side is evidence that "reassignment of event spaces is a standard practice in the hotel industry, one that 'happens all the time.'"  Omni SUMF ¶ 41 (citation omitted); see, e.g., Omni MSJ Ex. 6 [ECF No. 62-8] ("Darrow Dep. Tr.") at 42:1–9 ("[I]n the hotel world events move around all the time, so they get shifted from room to room based on . . . their size and different needs . . . ."), 61:10–62:15 (explaining that, despite the "Event Details" section, "there's flexibility in that as well.  There's usually a clause that indicates that the hotel has the right to move events as needed.  I think that's standard for hotel contracts," and that "it's not unusual . . . to end up doing entirely different things" than those listed in Event Details); Roche-Garland Dep. Tr. at 43:21–24 ("[I]t is common practice for events to be moved around the hotel."), 54:18–55:5 ("[The Agreement] did not preclude us . . . from relocating to an alternate space, as is standard practice in the hotel business."); Yienger Dep Tr. at 259:15–17 ("[Relocating the Gala is] a significant change, but it is not unusual and [is] our normal practice of business."); Omni MSJ Ex. 9 [ECF No. 62-11] ("Magsumbol Dep. Tr.") at 59:2–6 ("[Room reassignment] was common practice."), 102:5–103:6 (recounting conversation with Yienger where Magsumbol pointed out "that the reservation of rights to relocate the space provision didn't exist in the gala contract," and Yienger responded that the Hotel nevertheless retained such a right because of "the hotel's standard practice").

Even assuming that hotels generally retain a right unilaterally to reassign event spaces, however, there is evidence that this standard practice was not a part of the Agreement.  There is no express right-of-reassignment provision in the Agreement.  See, e.g., Darrow Dep. Tr. at 62:2–4 ("There's usually a clause that indicates that the hotel has a right to move events as needed." (emphasis added)); Roche-Garland Dep. Tr. at 55:15–19 (stating that the Agreement "is silent" on room reassignment).

Plaintiffs have also submitted evidence that, during negotiations for the first event Inova held at the Hotel in 2013, Hisaoka "insisted . . . that Omni delete the provision reserving to Omni the right to reassign space for the Gala that is otherwise contained in Omni's standard letter of agreement template."  Inova Opp'n at 23–24; see Inova MSJ Ex. A [ECF No. 63-3] ("Hisaoka Aff.") ¶¶ 8, 18–19 (attesting that, based on an unwanted reassignment of rooms at a previous hotel hosting the Gala, Hisaoka "insisted, while negotiating the contract for the 2013 Gala with Mr. Sanchez . . . , that Omni's standard provision reserving to Omni the right to reassign the Gala from the Ambassador and Regency ballrooms to other space be deleted from that contract," which was prepared by Sanchez); Inova MSJ Ex. E [ECF No. 63-7] ("Sanchez Dep. Tr. II") at 23:23–24:4 (testifying that the room-reassignment provision "was one of the items that was struck out" from the 2013 Gala Agreement).  The 2013 Gala contract, plaintiffs submit, was the basis for the 2019 Agreement, suggesting that removal of the room reassignment provision is pertinent to interpretation of the 2019 Agreement as well.  Inova Opp'n at 24; see Inova MSJ Ex. G [ECF No. 63-9] ("Inova Roche-Garland Dep. Tr.")[11] at 76:10–20 (agreeing that the 2019 Agreement was "based on the standard letter of agreement template").  Compare Embassy Agreement at 8 (reserving to Omni "the right to reassign the space listed on page one under the Event Details"), with Agreement at 7 (similar terms sheet containing no such express reservation).

The Court concludes that there are a number of material facts which are in genuine dispute and which are necessary to resolve the breach of contract issue.  Without weighing or assessing the credibility of this evidence, which would be inappropriate at summary judgment, see $17,900.00 in U.S. Currency, 859 F.3d at 1092, the Court cannot determine whether the

---

[11] Both Omni and Inova have produced different excerpts from a number of deponents' deposition transcripts. The Court will cite the version containing the relevant excerpts as necessary.

Agreement's silence on Omni's right to reassign event spaces implies that Omni was permitted unilaterally to move the Gala from the Ambassador and Regency Ballrooms to the Roberts Restaurant and Blue Room.  Certainly, there is considerable evidence that the Ambassador and Regency Ballrooms were important to Inova, given that the Agreement did not include a reassignment provision like the one Omni included in its agreement with the Embassy.  Moreover, there is undisputed evidence that plaintiffs deleted that reassignment provision during negotiations with Omni over the agreement for the 2013 Gala.  However, there is evidence that the standard practice in the hotel industry is to permit hotels to reassign event spaces.   Accordingly, the Court also cannot conclude whether the Agreement conferred an obligation on Omni to hold the Gala in the rooms listed in the Agreement, which is the second element in Inova's breach of contract claim.  See Zaccari, 390 F. Supp. 3d at 108.  Hence, the Court will deny the parties' cross-motions for summary judgment with respect to plaintiffs' claim for breach of contract.

### B.  Omni's Claim Against Inova

Omni asserts that, although Inova agreed to pay liquidated damages if it cancelled the Gala—which Omni alleges it did—"Inova has not paid Omni the liquidated damages of $29,000.00 required of Inova under the Agreement," Countercl. ¶ 27, and "therefore breached the Cancellation provision of the Agreement," id. ¶ 28, which was a "material term of the Agreement," id. ¶ 29.  Inova, for its part, claims that it has not breached the Agreement because Omni breached first by refusing to hold the Gala in the spaces listed in the Event Details section of the Agreement, thereby repudiating the Agreement and discharging Inova from any obligation to pay liquidated damages.  See Inova MSJ at 19–25; Inova Opp'n at 31–36.

As explained above, the Court has already concluded that it cannot resolve whether Omni breached the contract by reassigning the Gala to the Roberts Restaurant and Blue Room.  And for

the same reason, the Court cannot conclude whether <u>Inova</u> breached the Agreement by failing to

pay liquidated damages.  If Omni's room reassignment was a breach, that breach would excuse

Inova from its future performance under the Agreement if the breach were "material" (<u>i.e.</u>, if it

was so substantial "as to 'go to the essence' and frustrate substantially the purpose for which the

contract was agreed to by the injured party," <u>Keefe Co. v. Americable Int'l, Inc.</u>, 755 A.2d 469,

475 (D.C. 2000) (citation omitted)).  <u>See</u> <u>Africare, Inc. v. Xerox Complete Doc. Sols. MS, LLC</u>,

436 F. Supp. 3d 17, 38 (D.D.C. 2020) ("Under the common law rule of discharge, one party's

material breach of a contract will excuse the other party's performance." (citation omitted)).[12]  If

---

[12] The question whether any breach by Omni was material also depends upon disputed facts.  Under District of Columbia law, "[a] breach is material only if it relates to a matter of vital importance or if it goes to the essence [of the contract] and frustrates substantially the purpose for which the contract was agreed to by the injured party." <u>Kriesch</u>, 931 F. Supp. 2d at 253 (second alteration in original) (citation omitted).  Courts consider "a range of factors" including "the extent to which plaintiff will be deprived of the benefit which he reasonably expected under the contract" and "whether the breach was substantially serious." <u>Id.</u> at 253 (citations omitted).  But "[a]bsent a clear understanding of the relative weights of a party's obligations and other factors, it may be uncertain whether any given breach was a nonperformance of duty 'so material and important as to justify the injured party in regarding the whole transaction as at an end.'" <u>Keefe Co.</u>, 755 A.2d at 475 (quoting <u>Corbin on Contracts</u> § 946 (1951 ed. & Supp. 1999)).

Omni contends that the particular rooms in which the Gala was to be held "were immaterial to the Agreement," Omni MSJ at 35, while Inova contends that the relocation "plainly deprived Plaintiffs of the benefit which over several years they had come to reasonably expect," and that Omni's "purported service enhancements" were insufficient to make up for the breach, <u>see</u> Inova Opp'n at 34–35.  Both parties' assertions depend upon disputed facts, including details about the benefits and shortcomings of the respective event spaces.  <u>Compare, e.g.</u>, Inova MSJ Ex. C [ECF No. 63-5] ("Inova Hisaoka Dep. Tr.") at 73:1–16 ("[T]he Roberts Restaurant that was suggested for the silent auction, was really an open-air restaurant, not conducive to a black-tie event, and certainly not conducive to a silent auction . . . ."); <u>and</u> Sanchez Dep. Tr. II at 19:1–13 ("[Yes,] [A]mbassador/[R]egency combination are the best bet for [plaintiffs'] gala."), 46:17–20 (agreeing that "as drafter of the" 2013 Agreement, Sanchez considered the assigned rooms "to be material, central, or important to the contract"); 126:19–127:21 (testifying that the reassigned rooms "would not work at all" because the Blue Room "doesn't have any rig points, it has lower ceilings, it has pillars," so plaintiffs' expected audiovisual set-up would lead to "a very, very crowded room," and the reassignment to the Roberts Restaurant would mean "losing a lot of space"), <u>with, e.g.</u>, Omni Opp'n Ex. E [ECF No. 64-6] ("Schneider Dep. Tr.") ("agreeing that the Blue Room "has columns and . . . lower ceilings than the ballrooms," but explaining that he had "done nicer events in the [B]lue than . . . in the [R]egency [B]allroom because of the character of the room"); <u>and</u> Omni Opp'n Ex. B [ECF No. 64-3] ("Roche-Garland Dep. Tr. II") at 51:14–20 ("For the numbers that were expected to attend . . . it is our belief that it would have been . . . a far better event that would have been hosted in the [reassigned rooms].").

At summary judgment, the Court cannot determine "the extent to which [plaintiffs were] deprived of the benefit which [they] reasonably expected," <u>Kriesch</u>, 931 F. Supp. 2d at 253 (citation omitted), by the relocation of the Gala from the Ambassador and Regency Ballrooms to the Roberts Restaurant and the Blue Room.  Even though plaintiffs explicitly contracted for the particular rooms in the Agreement—and there is evidence that they took steps to <u>prevent</u> the Hotel from precisely this sort of unilateral relocation—it could be that the reassigned spaces were equally suitable to host the Gala, as Omni asserts.  If so, it could be that the reassignment was only a <u>partial</u> breach of the Agreement, which would not discharge plaintiffs of their duty to pay Omni liquidated damages for cancelling the

Omni's room reassignment was not a breach, then Inova would be obligated to pay Omni $29,000 in liquidated damages for cancelling the Gala between June 23 and July 22, 2019.  See Agreement at 3.  But, as explained above, the Court cannot conclude whether Omni had an obligation to host the Gala in the Ambassador and Regency Ballrooms, and, if so, whether its failure to do so was a material breach that discharged Inova of its duty to pay liquidated damages.  Accordingly, the Court will deny the parties' cross-motions on Omni's counterclaim for breach of contract.

## IV.     Breach of the Covenant of Good Faith and Fair Dealing

Finally, Inova alleges that Omni breached the implied covenant of good faith and fair dealing by "refusing to make available for the 2019 Gala the Hotel's Ambassador Ballroom and Regency Ballroom."  First Am. Compl. ¶ 47.  This covenant, implied in every contract in the District of Columbia, ensures "that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Abdelrhman v. Ackerman, 76 A.3d 883, 891 (D.C. 2013) (citation omitted).  "A party breaches this implied duty of good faith and fair dealing when it 'evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party.'"  McWilliams Ballard, Inc. v. Level 2 Dev., 697 F. Supp. 2d 101, 107 (D.D.C. 2010) (quoting Paul v. Howard Univ., 754 A.2d 297, 310 (D.C. 2000)); see also C & E Servs., Inc. v. Ashland, Inc., 498 F. Supp. 2d 242, 262 (D.D.C. 2007) ("The component of good faith emphasizes 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party,'" while the "component

---

Gala.  It could also be the case that the rooms were so inadequate or such a downgrade from the expected, and agreed-upon, facilities that the reassignment substantially deprived plaintiffs of the benefit of the Agreement, as Inova asserts. But the Court cannot weigh the evidence of the rooms' suitability at summary judgment.  See $17,900.00 in U.S. Currency, 859 F.3d at 1092.  Accordingly, the Court cannot reach a conclusion as to whether Omni's reassignment of spaces—if it was a breach of the Agreement—was a material breach that discharged Inova of its remaining obligations.

of fair dealing . . . emphasizes 'reasonable rather than arbitrary or capricious action.'" (quoting Allworth v. Howard Univ., 890 A.2d 194, 201 (D.C. 2006))).

Plaintiffs argue that, "instead of abiding by the spirit of the [Agreement] and allowing the Gala to proceed in the Ambassador and Regency Ballrooms as the parties contemplated," Omni "relocated the Gala over [plaintiffs'] strenuous objections" in order to host a more lucrative event for the Embassy of Lebanon.  Inova MSJ at 18.  Omni responds that, although it relocated the Gala, "it took into account the Gala's expected attendance and the size and capacity of" the reassigned rooms and "volunteered . . . complimentary service enhancements," all facts which "hardly depict an evasion of the Agreement's spirit, or interference with any party's performance," but instead show that "Omni acted reasonably in an effort to accommodate both Plaintiffs and the Embassy." Omni MSJ at 37–38.  But, as explained at length above in footnote 12, the parties vigorously dispute whether the reassigned rooms were a "reasonable" alternative to the Ambassador and Regency Ballrooms.  These same factual disputes preclude resolution of plaintiffs' claim for breach of the implied covenant of good faith and fair dealing at this stage.  If the reassignment had "the effect of destroying or injuring" plaintiffs' right "to receive the fruits of the contract," Abdelrhman, 76 A.3d at 891 (citation omitted), then plaintiffs may be able to prove that Omni breached the implied covenant; if the reassignment did not interrupt plaintiffs' "justified expectations," C & E Servs., Inc., 498 F. Supp. 2d 262, then Omni may not be liable for breach on this count.  But without weighing the evidence, which is inappropriate at this stage, the Court cannot resolve the parties' cross-motions and hence will deny both.

**V.    Plaintiffs' Motion for Attorney's Fees and Expenses**

Plaintiffs also request 96% of their attorney's fees and expenses incurred in bringing a motion to compel responses to twelve interrogatory requests and six requests for document production, see generally Pls.' Mem. of L. in Supp. of Mot. to Compel Resps. to Interrogs. & Doc.

Produc. Reqs. [ECF No. 22-1] ("Mot. to Compel"), which the Court largely granted, see Mem. Op., Jan. 29, 2021 [ECF No. 33] ("Fees Mem. Op.") at 13 (granting as to eleven of twelve interrogatory requests and three of six document production requests); see Mem. in Supp. of Pls.' Mot. for Attorney's Fees & Expenses [ECF No. 68-1] ("Fees Mot.") at 1, 11.  Omni responds that plaintiffs should be awarded only 6% of their fees and expenses because (1) plaintiffs sought to compel responses "to at least two interrogatories which they knew to be unnecessary," Omni's Mem. of L. in Opp'n to Fees Mot. [ECF No. 69] ("Fees Opp'n") at 3–6; (2) Omni prevailed on its objections to one interrogatory and (according to Omni) five of the document production requests, id. at 6–7; (3) some of the discovery requests are now moot, id. at 7; and (4) the Court should offset any award to plaintiffs in the amount of Omni's fees and expenses in successfully opposing some of the requests, id. at 8–9.  Plaintiffs' motion for fees is fully briefed and ripe for consideration. See generally Pls.' Reply to Fees Opp'n [ECF No. 70].  The Court will partially grant plaintiffs' fees motion and award plaintiffs 60% of their attorney's fees and expenses.[13]

If a court grants a discovery motion, it "must, after giving an opportunity to be heard, require the party . . . whose conduct necessitated the motion . . . to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees."  Fed. R. Civ. P. 37(a)(5)(A). But the court "must not" order payment if, inter alia, the opponent's "nondisclosure, response, or objection was substantially justified" or if "other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(a)(5)(A)(ii)–(iii).  Rule 37(a)(5)(C) permits a court to "apportion the reasonable expenses for the motion" if it was granted in part and denied in part.  See Baylor v. Mitchell Rubenstein & Assocs., P.C., 857 F.3d 939, 951 (D.C. Cir. 2017).

---

[13] Neither plaintiffs nor Omni have provided the Court with the actual dollar amount of the fee request.

"Courts apportion reasonable expenses by looking at each individual claim for relief, and determining whether the actions of the non-prevailing party were 'substantially justified,'" <u>Buie v. Dist. of Columbia</u>, 327 F.R.D. 1, 15 (D.D.C. 2018), meaning that there is a "genuine dispute" or that "'reasonable people could differ' as to the appropriateness of the motion to compel," <u>McNamara v. Picken</u>, Civ. A. No. 11-1051 (ESH/JMF), 2013 WL 2423804 (D.D.C. June 4, 2013), at *1 (quoting <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)). "If there was no support given for the objection, then the objection is not justified." <u>McNamara</u>, 2013 WL 2423804, at *1. Courts also consider "the relative success of the parties when apportioning expenses." <u>Buie</u>, 327 F.R.D. at 15; <u>accord</u> <u>D.L. v. Dist. of Columbia</u>, 251 F.R.D. 38, 49 (D.D.C. 2008) ("The Court's overwhelming decision for the plaintiffs on the merits of their motion is sufficient to show that the [defendant]'s objections were not substantially justified.").

The Court granted eleven of plaintiffs' twelve interrogatory requests and three of plaintiffs' six requests for document production. Fees Mem. Op. at 6–13. The Court handily concluded that Omni's responses were inadequate, <u>e.g.</u>, <u>id.</u> at 8, and that its objections to many of plaintiffs' requests were "skeletal" and—often—lacked sufficient specificity, <u>e.g.</u>, <u>id.</u> at 5. The Court will not now accept Omni's invitation to revisit these conclusions. <u>See</u> Fees Opp'n at 8. Additionally, the Court disagrees with Omni's contention that Interrogatories 5 and 15—which sought records relating to "the participation of <u>Smith Center</u> and Special Love in the planning or conduct of any Gala between 2008 and 2019" and the parties' intent "for the Gala to benefit directly <u>Smith Center</u> and Special Love"—were "unnecessary," <u>id.</u> at 3–4 (emphases added) (citations omitted), as evidenced by the Court's conclusion herein that Smith Center has standing as a third-party beneficiary to the Agreement. Nor does the fact that some of plaintiffs' requests later became

moot, with the dismissal of the Embassy of Lebanon as a defendant, justify Omni's failure to respond.  See id. at 7.  Accordingly, the Court rejects Omni's arguments on those points.

But the Court agrees to some extent that plaintiffs' reward should be reduced to reflect their merely partial success, and that an award against Omni should be offset by Omni's successful defense as to some of plaintiffs' requests.  Although the Court does not agree that Omni "at least substantially prevailed" as to plaintiffs' Document Production Requests 8 and 11, but see Fees Mem. Op. at 12 ("Omni failed to specify any grounds for its objections to either request until its brief in opposition to plaintiffs' motion to compel."); McNamara, 2013 WL 2423804, at *1, the Court agrees that plaintiffs prevailed on only fourteen (around 75%) of their requests, and that Omni successfully defended against the remaining four requests.  The parties' briefing on all of the requests was fairly evenly divided as between plaintiffs' eighteen requests, with slightly more briefing dedicated to Interrogatory 7 (on which Omni prevailed) and Interrogatory 8.  See Mot. to Compel at 9–12; Omni's Opp'n to Mot. to Compel [ECF No. 23] at 7–11; Pls.' Reply to Omni's Opp'n to Mot. to Compel [ECF No. 24] at 6–11.  Accordingly, and accounting for Omni's partial success in opposing plaintiffs' requests, the Court will award plaintiffs 60% of their reasonable attorney's fees and expenses incurred in bringing their motion to compel.

## Conclusion

For the foregoing reasons, the Court will deny both parties' motions for summary judgment.  Accordingly, three claims remain in this litigation:  plaintiffs' claims that Omni breached the Agreement and breached the implied covenant of good faith and fair dealing, and Omni's claim that Inova breached the Agreement.  The Court will also award plaintiffs 60% of their reasonable attorney's fees and expenses incurred in moving to compel Omni to respond to

interrogatories and requests for document production.  A separate Order to that effect shall issue on this date.


_____
/s/
JOHN D. BATES
United States District Judge

Dated: September 30, 2022