**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| INOVA HEALTH CARE SERVICES, FOR INOVA FAIRFAX HOSPITAL AND ITS DEPARTMENT, LIFE WITH CANCER et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 20-784 (JDB) |
| OMNI SHOREHAM CORP., | |
| Defendant. | |

**MEMORANDUM OPINION**

This case involves a contract between plaintiffs—Inova Health Care Services, for Inova Fairfax Hospital and its Department, Life with Cancer ("Inova") and Smith Center for Healing and the Arts ("Smith Center")—and defendant Omni Shoreham Corporation ("Omni"). The parties agreed that plaintiffs would hold an annual fundraising gala in the Ambassador and Regency Ballrooms of the Omni Shoreham Hotel ("Hotel") on September 21, 2019. Each side alleges that the other breached the contract—plaintiffs assert that Omni breached by relocating the event to different rooms in the Hotel, and Omni claims that Inova breached by refusing to pay liquidated damages after canceling the gala. Both parties sought summary judgment, see Omni's Mem. of Law Supporting Its Mot. for Summ. J. [ECF No. 62-1] ("Omni MSJ"); Mem. in Supp. of Inova's Mot. for Summ. J. [ECF No. 63-1] ("Inova MSJ"), and the Court denied both motions, see Inova Health Care Servs. v. Omni Shoreham Corp., Civ. A. No. 20-784 (JDB), 2022 WL 4598578 (D.D.C. Sept. 30, 2022).

1

Plaintiffs now seek reconsideration of the Court's order denying their motion for summary judgment.  See Pl.'s Mot. for Recons. [ECF No. 76]; Mem. in Supp. of Pl.'s Mot. for Recons. [ECF No. 76-1] ("Mot. for Recons.").  For the reasons that follow, the Court will grant plaintiffs' motion for reconsideration and enter summary judgment in favor of plaintiffs on each remaining claim.

## Background

### I.    Factual Background

Beginning in 2013, and every year thereafter through 2018, the "Joan Hisaoka 'Make a Difference' Gala" (the "Gala")—which is organized by Robert Hisaoka through his company RGH Management Services, LLC ("RGH")—was held at the Hotel.  Omni's Statement of Undisputed Facts Supporting Omni MSJ [ECF No. 62-2] ("Omni SUMF") ¶¶ 2, 3; see Pl.'s Statement of Material Facts as to Which There Is No Genuine Dispute [ECF No. 63-2] ("Inova SUMF") ¶ 2.  The Gala "raise[d] money to support organizations, including Inova" and the Smith Center.  Inova SUMF ¶¶ 2, 109; see Omni SUMF ¶¶ 1, 5.

On December 14, 2018, Hisaoka—acting on behalf of Inova—signed a contract with Omni, providing that the Hotel would host the 2019 Gala on September 21, 2019.[1]  First Am. Compl. Ex. A [ECF No. 26] ("Agreement") at 1–2, 6;[2] see Inova SUMF ¶ 46; Omni SUMF ¶¶ 10, 15.  The "Event Details" section of the Agreement lists the Gala's reserved locations as the "Ambassador Ballroom" for a "Cocktail Reception" and "Dessert Reception," and the "Regency Ballroom" for a "Gala Dinner."  Agreement at 2; Omni SUMF ¶ 16; Inova SUMF ¶ 47.  Under the "Cancellation" provision, the Agreement states that if Inova cancelled the Gala "between June 23, 2019 and July

---

[1] Hisaoka was authorized to do so under a written fundraising agreement with Inova, which gave Hisaoka and RGH "full authority and responsibility for planning, organizing and implementing the [Gala]," including the right and responsibility to enter into "contracts and agreements associated with the [Gala] . . . on behalf of, and as agent for," the beneficiaries.  See Fundraising Agreement – 2019 [ECF No. 62-3].

[2] The Agreement and other exhibits are appended in the same document as Inova's First Amended Complaint.  The Court will refer to pages from the exhibits according to their internal pagination.

22, 2019," it would pay "$29,000.00" "as liquidated damages and not as a penalty."  Agreement at 3; <u>see</u> Inova SUMF ¶ 55.  Finally, under the section "Changes, Additions, Stipulations, or Lining Out," the parties agreed that "[a]ny changes, additions, stipulations, or decisions . . . w[ould] not be considered agreed to or binding unless such modifications [were] initialed or otherwise approved in writing by both parties."  Agreement at 6; <u>see</u> Inova SUMF ¶ 57; <u>see also</u> Omni's Statement of Material Facts in Dispute, in Opp'n to Inova MSJ [ECF No. 64-1] ("Omni SDF") ¶ 57 (disputing Inova's assertion that this provision prevented the Hotel from unilaterally reassigning the event spaces).

On July 8, 2019, an Omni employee informed Hisaoka by email that the Hotel had relocated, or was planning to relocate, the Gala from the Ambassador and Regency Ballrooms to alternative spaces at the Hotel (namely, the Roberts Restaurant and the Blue Room).  Omni SUMF ¶¶ 38–39; Inova SUMF ¶ 80; <u>see</u> Pl.'s Statement of Facts as to Which There Is Genuine Dispute [ECF No. 65-2] ("Inova SDF") ¶ 10 (indicating that the parties dispute whether the July 8 email informed plaintiffs that Omni "had relocated" or "was planning to relocate" the Gala).  By a letter dated July 9, 2019, plaintiffs' counsel responded to that email and demanded that Omni reverse its decision to relocate the Gala.  Omni SUMF ¶ 42; Inova SUMF ¶¶ 85–86; <u>see</u> First Am. Compl. Ex. C [ECF No. 26] at 2 ("Please consider this letter a demand for an <u>immediate</u> rescission of [the July 8] e-mail . . . .  In the event the Hotel fails to rescind the e-mail in writing by 5:00 p.m. tomorrow[,] . . . our client intends to immediately seek all legal and equitable remedies available . . . .").  Omni declined to rescind its reassignment decision, Omni SUMF ¶ 43; Inova SUMF ¶ 87; <u>see</u> First Am. Compl. Ex. D [ECF No. 26] ("July 11 Email") at 1 ("The Hotel stands by its offer to hold the [Gala] in the [alternative spaces identified in the July 8 email,] . . . and the

Hotel remains ready and willing . . . to host the Gala in this alternative space . . . . [W]e hope [plaintiffs] will reconsider the Hotel's offer.").

Plaintiffs' counsel responded by letter on July 12, 2019, informing Omni that plaintiffs would not hold the Gala at the Hotel.  Omni SUMF ¶ 45; Inova SUMF ¶ 104; see Inova SDF ¶ 12 (disputing whether plaintiffs refused to hold the Gala at the Hotel or whether they refused to hold the Gala in the reassigned spaces within the Hotel); First Am. Compl. Ex. E [ECF No. 26] ("July 12 Letter") at 3 ("[The July 11 email] only confirms further unequivocally and positively that the Hotel has repudiated the terms and conditions of the Agreement . . . .  Accordingly, please be advised that our client has decided against holding the [Gala] at the Hotel and, instead, will file suit against the Hotel and seek all remedies that are available under the Agreement and at law . . . .").

Inova ultimately held its 2019 Gala at the Mandarin Oriental Hotel on September 21, 2019. Omni SUMF ¶ 54; Inova SUMF ¶ 109.  And, pursuant to a contract signed by Omni on July 8, 2019, Omni hosted an event for the Embassy of Lebanon in the Regency and Ambassador Ballrooms of the Hotel "from September 19, 2019, through September 22, 2019."  Omni SUMF ¶ 37; Inova SUMF ¶ 103; see Omni MSJ Ex. 6 [ECF No. 62-8] ("Embassy Agreement") at 1–8[3] (Letter of Agreement between Embassy of Lebanon and Omni for an event from "9/19/2019 – 9/22/2019").

## II.  Procedural History

In March 2020, plaintiffs filed suit against Omni in D.C. Superior Court, alleging that Omni breached the Agreement and the implied covenant of good faith and fair dealing.  See Compl.

---

[3] The Embassy Agreement is attached as an exhibit in the same document as the transcript of Susan E. Darrow's deposition.  The Court will cite the Embassy Agreement using its internal pagination.

[ECF No. 1-3] ¶¶ 36–40, 42–44.[4]  Omni removed the case to this Court, see Notice of Removal [ECF No. 1] at 1, answered the complaint, see Answer [ECF No. 4], and moved to dismiss the claims of Smith Center and another (now-dismissed) plaintiff, see Omni's Mot. to Dismiss Pls. Smith Center & Special Love [ECF No. 3]; Stipulation of Dismissal [ECF No. 61] at 1.  The Court denied Omni's motion.  See Inova Health Care Servs. for Inova Fairfax Hosp. v. Omni Shoreham Corp., Civ. A. No. 20-784 (JDB), 2020 WL 4201661, at *9 (D.D.C. July 22, 2020).  Plaintiffs filed an amended complaint, see First Am. Compl., which Omni then moved to dismiss in part, see Mot. to Dismiss [ECF No. 29] at 1 (seeking to dismiss, inter alia, plaintiffs' claims for breach of contract and breach of the covenant of good faith and fair dealing).  The Court denied Omni's motion, Inova Health Care Servs. for Inova Fairfax Hosp. v. Omni Shoreham Corp., Civ. A. No. 20-784 (JDB), 2021 WL 1405953, at *6 (D.D.C. Apr. 14, 2021), and Omni answered the amended complaint, this time asserting a counterclaim against Inova for breach of contract, Omni's Answer to First Am. Compl. & Countercl. Against Pl. Inova [ECF No. 46] ("Countercl.") ¶¶ 20–33.[5]  Inova moved to dismiss Omni's counterclaim, see Pl.'s Mot. to Dismiss Def. Omni's Countercl. [ECF No. 50], and the Court denied that motion, see Inova Health Care Servs. for Inova Fairfax Hosp. v. Omni Shoreham Corp., Civ. A. No. 20-784 (JDB), 2022 WL 8176488, at *6 (D.D.C. Mar. 22, 2022).

After resolving these initial disputes, three claims remained: (1) plaintiffs' claim against Omni for breach of contract, (2) plaintiffs' claim against Omni for breach of the implied covenant

---

[4] Plaintiffs also filed suit against "John Doe Organization"—the entity with which Omni contracted to host a different event in the Ambassador and Regency Ballrooms on September 19, 2021—for tortious interference with contractual relations.  Compl. ¶¶ 5, 16–17, 46–49.  Additionally, plaintiffs claimed that Omni and John Doe Organization engaged in a "civil conspiracy."  Id. ¶¶ 51–53.  "John Doe Organization," later identified as the Embassy of Lebanon, was dismissed from this suit in July 2021.  See Notice of Dismissal [ECF No. 60] at 1.

[5] Omni's answer and counterclaim are contained in the same filing, with the counterclaim beginning on page 18; the paragraphs in the counterclaim restart at paragraph 1.  The Court will cite the counterclaim by its own paragraph numbers.

of good faith and fair dealing, and (3) Omni's counterclaim against Inova for breach of contract. Both parties then moved for summary judgment on all claims.

On September 30, 2022, the Court denied the parties' motions for summary judgment.  As a preliminary matter, the Court rejected Omni's renewed argument that both Smith Center and Inova lacked standing to assert claims against Omni.  Inova, 2022 WL 4598578, at *5–8.  Next, the Court rejected Omni's argument that plaintiffs' claims must fail because the parties had "voluntarily rescinded" the contract when plaintiffs accepted and cashed a $10,000 check from Omni returning their deposit.  Id. at *8–10; see id. at *10 ("[T]he Court concludes that there was no mutual consent of the parties to rescind the Agreement . . . ." (internal quotation marks omitted)).

The Court then addressed the parties' dueling breach-of-contract claims.  First, plaintiffs claimed that Omni had a contractual obligation to hold the Gala in the Ambassador and Regency Ballrooms, as specified in the Agreement, and that Omni breached the Agreement by refusing to host the Gala in those spaces.  Inova, 2022 WL 4598578, at *11.  The Court denied summary judgment to either party on plaintiffs' claim against Omni.

The Court determined that "the Agreement is ambiguous on the question of reassignment" and decided that it would "look to the parties' proffered extrinsic evidence to determine whether the Agreement allowed Omni unilaterally to reassign spaces for the 2019 Gala."  Inova, 2022 WL 4598578, at *11.  The Court noted evidence "[o]n Omni's side" that "reassignment of event spaces is a standard practice in the hotel industry, one that 'happens all the time.'"  Id. at *12 (quoting Omni SUMF ¶ 41 and citing numerous deposition transcripts).  But "[e]ven assuming that hotels generally retain a right unilaterally to reassign event spaces, . . . there is evidence that this standard practice was not a part of the Agreement" as "[t]here is no express right-of-reassignment provision

6

in the Agreement." Id.  On plaintiffs' side, the Court weighed "evidence that, during negotiations for the first event Inova held at the Hotel in 2013, Hisaoka 'insisted . . . that Omni delete the provision reserving to Omni the right to reassign space for the Gala that is otherwise contained in Omni's standard letter of agreement template." Id. (quoting Pls.' Opp'n to Omni MSJ [ECF No. 65] ("Inova SJ Opp'n") at 23–24, and citing an affidavit and deposition transcript).  Plaintiffs argued that "[t]he 2013 Gala contract . . . was the basis for the 2019 Agreement, suggesting that removal of the room reassignment provision is pertinent to interpretation of the 2019 Agreement as well." Id.

The Court concluded that

there are a number of material facts which are in genuine dispute and which are necessary to resolve the breach of contract issue.  Without weighing or assessing the credibility of this evidence, which would be inappropriate at summary judgment, the Court cannot determine whether the Agreement's silence on Omni's right to reassign event spaces implies that Omni was permitted unilaterally to move the Gala from the Ambassador and Regency Ballrooms to the Roberts Restaurant and Blue Room.  Certainly, there is considerable evidence that the Ambassador and Regency Ballrooms were important to Inova, given that the Agreement did not include a reassignment provision like the one Omni included in its agreement with the Embassy.  Moreover, there is undisputed evidence that plaintiffs deleted that reassignment provision during negotiations with Omni over the agreement for the 2013 Gala.  However, there is evidence that the standard practice in the hotel industry is to permit hotels to reassign event spaces.  Accordingly, the Court also cannot conclude whether the Agreement conferred an obligation on Omni to hold the Gala in the rooms listed in the Agreement . . . .

Inova, 2022 WL 4598578, at *12 (citations omitted).  For those reasons, "the Court . . . den[ied] the parties' cross-motions for summary judgment with respect to plaintiffs' claim for breach of contract." Id.

In its counterclaim, Omni argued that "although Inova agreed to pay liquidated damages if it cancelled the Gala . . . Inova has not paid Omni the liquidated damages of $29,000.00 required of Inova under the Agreement, and therefore breached the Cancellation provision of the

Agreement, which was a material term of the Agreement." Inova, 2022 WL 4598578, at *13 (internal quotation marks and citations omitted). But the Court explained that because it "ha[d] already concluded that it cannot resolve whether Omni breached the contract by reassigning the Gala to the Roberts Restaurant and Blue Room . . . for the same reason, the Court cannot conclude whether Inova [subsequently] breached the Agreement by failing to pay liquidated damages." Id. That is, Inova would have been relieved of its obligation to pay liquidated damages only if Omni was the first to materially breach the contract. Id. Accordingly, the Court denied the parties' cross-motions on Omni's counterclaim for breach of contract. Id.

Finally, the Court considered Inova's claim "that Omni breached the implied covenant of good faith and fair dealing by refusing to make available for the 2019 Gala the Hotel's Ambassador Ballroom and Regency Ballroom." Inova, 2022 WL 4598578, at *14 (internal quotation marks omitted). After noting that "the parties vigorously dispute whether the reassigned rooms were a 'reasonable' alternative to the Ambassador and Regency Ballrooms," the Court concluded that it could not resolve the parties' cross-motions "without weighing the evidence, which [would be] inappropriate at this stage," and accordingly, it denied both motions. Id.

On October 24, 2022, plaintiffs filed a motion for reconsideration of the Court's Order denying summary judgment. Mot for Recons. Plaintiffs identified two alleged "error[s] of apprehension" by the Court. Id. at 1–2. First, regarding the Court's denial of summary judgment to plaintiffs on their breach of contract claim, plaintiffs claimed that "the Court failed to consider undisputed evidence" that even if reassignment of event spaces is a standard practice of hotels, "any such practice is undertaken only with the customer's consent, and never unilaterally." Id. at 1. Second, regarding the Court's denial of summary judgment to plaintiffs on Omni's breach of contract claim, plaintiffs argued that, by focusing on "whether Inova was discharged from

liability for liquidated damages," the Court "failed to consider undisputed evidence that Omni's claim for liquidated damages is, in any event, precluded by the Contract." Id. at 1–2.

On November 15, 2022, Omni filed an opposition to plaintiffs' motion for reconsideration. Def. Omni's Mem. of Law in Opp'n to Mot. for Recons. of the Court's Sept. 30, 2022 Order [ECF No. 78] ("Opp'n to Mot. for Recons."). On November 23, 2022, Plaintiffs filed a reply in support of their motion for reconsideration. Reply to Opp'n to Mot. for Recons. ("Reply ISO Mot for Recons."). Plaintiffs' motion is now ripe for decision.

## Legal Standard

"Rule 54 governs reconsideration of interlocutory orders . . . ." Ali v. Carnegie Inst. of Washington, 309 F.R.D. 77, 80 (D.D.C. 2015); see Fed. R. Civ. P. 54(b) ("[A]ny order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."). Although Rule 54(b) "sets forth little guidance as to when such review is appropriate," courts in this district have concluded that "such reconsideration is appropriate 'as justice requires.'" Scott v. Conley, 937 F. Supp. 2d 60, 64 (D.D.C. 2013) (quoting Hoffman v. Dist. of Columbia, 681 F. Supp. 2d 86, 90 (D.D.C. 2010)).

Accordingly, "[d]istrict courts retain broad discretion to reconsider earlier orders and may 'elect to grant a motion for reconsideration if there are . . . good reasons for doing so.'" Emp. L. Grp., P.C. v. San Diego Emp. L. Grp., Civ. A. No. 20-1852 (JDB), 2021 WL 3931872, at *1 (D.D.C. Sept. 2, 2021) (quoting Cobell v. Norton, 355 F. Supp. 2d 531, 540 (D.D.C. 2005)). Such "good reasons," id., include "whether the court has patently misunderstood a party, has made a decision outside the adversarial issues presented to the court by the parties, has made an error not of reasoning, but of apprehension, or where a controlling or significant change in the law or facts

has occurred since the submission of the issue to the court." Scott, 937 F. Supp. 2d at 64–65

(quoting Ficken v. Golden, 696 F. Supp. 2d 21, 35 (D.D.C. 2010)) (cleaned up).   However,

"motions for reconsideration . . . cannot be used as an opportunity to reargue facts and theories

upon which a court has already ruled, nor as a vehicle for presenting theories or arguments that

could have been advanced earlier." Dunlap v. Presidential Advisory Comm'n on Election

Integrity, 319 F. Supp. 3d 70, 81 (D.D.C. 2018) (quoting Estate of Gaither ex rel. Gaither v. Dist.

of Columbia, 771 F. Supp. 2d 5, 10 & n.4 (D.D.C. 2011)).

　　　While "[t]he moving party has the burden of showing that reconsideration is warranted,

and that some harm or injustice would result if reconsideration were to be denied," Nguyen v. Vu,

Civ. A. No. 19-894 (DLF), 2021 WL 2809435, at *3 (D.D.C. July 6, 2021) (quoting Pueschel v.

Nat'l Air Traffic Controllers' Ass'n, 606 F. Supp. 2d 82, 85 (D.D.C. 2009)), a district court also

possesses the "inherent authority to revisit and alter its own orders" sua sponte prior to the entry

of judgment, Bailey v. Potter, 498 F. Supp. 2d 320, 321 (D.D.C. 2007).[6]

## Analysis

### I.　Plaintiffs' Breach of Contract Claim

　　　Plaintiffs first suggest that the Court erred when it denied summary judgment on plaintiffs'

breach of contract claim.   The Court had concluded that it could not determine whether Omni was

obligated to hold the Gala in the listed rooms, in part due to evidence that the standard practice in

the hotel industry is to permit hotels to reassign event spaces.   Plaintiffs now insist that "the Court

failed to consider undisputed evidence" that even if reassignment of event spaces is a standard

practice of hotels, "any such practice is undertaken only with the customer's consent, and never

---

[6] As this Court has previously noted, "the law of the case doctrine does not bind the Court to its prior interlocutory order[s]." Inova, 2021 WL 1405953, at *4 (emphasis omitted) (citing Hamilton v. Geithner, 616 F. Supp. 2d 49, 54–55 (D.D.C. 2009)).

unilaterally." Mot. for Recons. at 1. Omni responds that "[t]he evidence of the industry standard is clear, though the standard is not what Plaintiffs claim it is: hotels generally reserve the right to reassign reserved event spaces, irrespective of whether a written agreement pertaining to the reserved space expressly reserves that right." Opp'n to Mot. for Recons. at 19.

Accordingly, more than half of the briefing on this motion features an intense debate about the precise nature of the Hotel industry's standard practice of reassigning rooms. It struck the Court as odd that this quarrel over industry practice had become so central to the case, especially when there seems to be no evidence that the Hotel ever actually followed the alleged industry standard that Omni advanced. This realization led the Court to review again very closely the record and the parties' summary judgment briefing, as well as its prior decision, and the Court discovered some misapprehensions that it will now correct. Specifically, the Court reached two conclusions in its summary judgment decision that it now re-examines: first, that "the Agreement is ambiguous on the question of reassignment," and second, that certain extrinsic "evidence that the standard practice in the hotel industry is to permit hotels to reassign event spaces" prevents the Court from "conclud[ing] whether the Agreement conferred an obligation on Omni to hold the Gala in the rooms listed in the Agreement." Inova, 2022 WL 4598578, at *12.

### A. Ambiguity

The Court previously determined that the Agreement was "ambiguous on the question of reassignment" given that "[n]either party . . . assert[ed] that the Agreement is clear on the issue of room reassignment." Inova, 2022 WL 4598578, at *11. The Court's basis for concluding that neither party asserted the Agreement was unambiguous was that "both rel[ied] on some form of extrinsic evidence to interpret it." Id. Upon review, the Court realizes that its understanding of

the parties' positions was not wholly accurate.  The Court now revisits the text of the Agreement

and holds that it unambiguously prohibits room reassignment absent mutual consent.

In its summary judgment motion, Inova first and foremost argued that "the 2019 Gala

Contract . . . is unambiguous" because "the clear terms of the Gala Contract . . . specified that the

Gala would occur in the Ambassador and Regency Ballrooms."  Inova MSJ at 11–12; see id. at 13

("[T]he meaning of the Contract is clear and definite, and Omni has never suggested otherwise,

. . . that the Contract required the Gala to occur in the Ambassador and Regency Ballrooms.").  In

other words, Inova argued that the plain language of the Agreement mandated that the Gala be

held in contractually specified event spaces, which presumes that reassignment was not permitted

absent mutual assent.

Omni, on the other hand, argued that even though the Agreement enumerated specific

rooms, it is technically "silen[t] on Omni's ability to reassign the 2019 Gala to alternate event

spaces," which effectively amounts to an argument that the omission of a reassignment term

renders the Agreement ambiguous—i.e., the Agreement's silence could either imply that

reassignment is or is not permitted.  Omni MSJ at 25.  According to Omni, the Court could read

an "implied prohibition[]" or "negative covenant[]" barring reassignment into the Agreement's

silence but should instead construe the omission as permitting "reasonable reassignment of space"

because "[n]othing in the Agreement expressly prohibits Omni from following [the] established

industry practice" of reassigning events "to alternate spaces in the same hotel, on the same date."

Id. at 26, 28, 30.[7]

Although Inova also cited extrinsic evidence of prior negotiations that bolsters its

interpretation of the text and counters Omni's arguments, see, e.g., Inova MSJ at 13–14; Inova SJ

---

[7] As the Court previously noted, "Omni's arguments are arguably conflicting," as it primarily contends that
"the Court should consider extrinsic evidence of industry practice" in order to interpret the Agreement's silence on

Opp'n at 23–24, the Court now recognizes that it was too quick to accept that Inova's "rel[iance] on . . . extrinsic evidence" meant that plaintiffs did not "assert[] that the Agreement is clear on the issue of room reassignment." Inova, 2022 WL 4598578, at *11. For one, a party can both argue that a contract is unambiguous and provide extrinsic evidence that supports that reading in the event the court disagrees regarding ambiguity. More importantly, however, Inova argued that this extrinsic evidence should be admitted as part of a "reasonableness determination" that applies to contract interpretation under D.C. law "whether or not the contract's language appears ambiguous." See Inova MSJ at 7–8 (quoting Potomac Elec. Power Co. v. Mirant Corp., 251 F. Supp. 2d 144, 149 (D.D.C. 2003)); id at 13–14 (arguing that a "reasonable person in the position of the parties at the time that the Contract was entered would also know all the surrounding circumstances before and during the making of the Contract, including" extrinsic evidence of prior negotiations). Therefore, such extrinsic evidence might be admissible, even if the Court determines the Agreement is unambiguous. See, e.g., Christacos v. Blackie's House of Beef, Inc., 583 A.2d 191, 194 (D.C. 1990) ("[A]lthough extrinsic evidence of the parties' subjective intent may be resorted to only if the document is ambiguous, extrinsic evidence may be considered to determine the circumstances surrounding the making of the contract so that it may be ascertained what a reasonable person in the position of the parties would have thought the words meant." (cleaned up)). The Court will address the intricacies of this aspect of D.C. contract law in greater detail below, but suffice it to say that plaintiffs' introduction of extrinsic evidence of prior negotiations was not a concession that the Agreement is ambiguous.

Because the Court mistakenly assumed that the parties' reliance on extrinsic evidence

---

reassignment, but also asserts in reply "that mere silence on a particular question is not enough to generate ambiguity." Inova, 2022 WL 4598578, at *11 n.10 (citing Omni's Mem. in Reply to Inova SJ Opp'n [ECF No. 66] ("Omni SJ Reply") at 11–13).

necessarily meant that neither side disputed the Agreement's ambiguity, the Court's summary judgment opinion did not closely parse the text of the Agreement in order to make an independent determination about whether it is subject to more than one reasonable interpretation. The Court does so now.

"The District of Columbia applies the objective theory of contracts, meaning that 'the language of the agreement <u>as it is written</u> governs the obligations of the parties unless that language is unclear . . . .'" <u>Kriesch v. Vilsak</u>, 931 F. Supp. 2d 238, 253 (D.D.C. 2013) (emphasis added) (quoting <u>Simon v. Circle Assocs., Inc.</u>, 753 A.3d 1006, 1012 (D.C. 2000)). "[T]he first and most important step in ascertaining [the parties'] intent is examination of the contract itself, for if a document is facially unambiguous, its language should be relied upon as providing the best objective manifestation of the parties' intent." <u>Daisley v. Riggs Bank, N.A.</u>, 372 F. Supp. 2d 61, 69 (D.D.C. 2005) (internal quotation marks and brackets omitted).[8]

Looking at the portions of the Agreement relevant to Inova's breach of contract claim, the Court perceives no ambiguity. The "Event Details" section of the Agreement lists the Gala's reserved locations as the "Ambassador Ballroom" for the "Cocktail Reception" and "Dessert Reception," and the "Regency Ballroom" for the "Gala Dinner."[9] Agreement at 2. In another

---

[8] Omni affirmatively argued that the Agreement is fully integrated and that the parol evidence rule applies to it, such that "extrinsic . . . evidence which tends to contradict, vary, add to, or subtract from the terms of [the] written contract" must be excluded. Omni's SJ Reply at 13–14 (emphasis omitted) (quoting <u>Segal Wholesale, Inc. v. United Drug Serv.</u>, 933 A.2d 780, 783 (D.C. 2007)); <u>see also</u> <u>Abdelrhman v. Ackerman</u>, 76 A.3d 883, 888 (D.C. 2013) ("In interpreting contractual language, [D.C. courts] adhere to the parol evidence rule, which limits the court's analysis to the plain meaning of the language on the face of a fully integrated contract.").

[9] The Court gives no weight to Omni's textual argument that because a dictionary defines the term "details" as "'[s]mall parts' or 'particulars,'" the specifications of the Agreement's "Event Details" section "hardly qualify as contractual 'terms.'" Omni MSJ at 28 (quoting Webster's New World Dictionary at 384 (2d Col. 1984)). Omni goes so far as to suggest that those specifics were "non-binding" and "were not conditions limiting or defining the Agreement's scope or the action required of Omni under the Agreement." <u>Id.</u> at 29. Those "details"—which appear in the second section of the Agreement (arguably the first substantive section) and make up a substantial portion of the short, six-page contract—include objectively significant terms, like the dates and times of the Gala events. The Court must "giv[e] . . . effective meaning to <u>all</u> [of the Agreement's] terms," <u>Carlyle Inv. Mgmt. L.L.C. v. Ace Am.</u>

section entitled "Changes, Additions, Stipulations, or Lining Out," the parties agreed that "[a]ny changes, additions, stipulations, or decisions . . . w[ould] not be considered agreed to or binding unless such modifications [were] initialed or otherwise approved in writing by both parties." Id. at 6.

These terms are quite simple. Omni agreed to host the plaintiffs' event in specific rooms, on specific dates, and at specific times. Agreement at 2. If "the Hotel" sought to make "[a]ny changes," it would need to obtain written consent from Inova. Id. at 6. Any reasonable person would understand that moving a portion of the event from the contractually specified venue to a different space that does not appear in the Agreement—i.e., a room reassignment—would be a "change" requiring written approval of both parties. There is nothing in the written language of the Agreement that could possibly be read to suggest that location changes would be treated distinctly from the requirements that apply to "[a]ny changes." Accordingly, the Court no longer agrees with its prior determination, see Inova, 2022 WL 4598578, at *12, and now concludes that "the language of the agreement as it is written," Kriesch, 931 F. Supp. 2d at 253, is facially unambiguous: Omni was not permitted to unilaterally change the contracted-for rooms without plaintiffs' consent.

Omni asks the Court to look beyond the written text of the Agreement and determine the parties' obligations based on inferences drawn from the Agreement's omissions. Omni insists that,

---

Ins. Co., 131 A.3d 886, 895 (D.C. 2016) (emphasis added), and the Court sees no reason to conclude that these details were not intended to be binding on the parties.

Further, a separate provision in the Agreement emphasizes the significance of specific event spaces. The "Cancellation" provision dictates that, in the event that plaintiffs cancelled the event, their ability to obtain beneficial "credit[s]" for their liquidated damages payments would depend on whether Omni was able to "book another function in the Regency Ballroom." Agreement at 3 (emphasis added). Omni's insistence that another event only qualifies as cover if it is held in the same room undercuts its argument that the contractual selection of that room is an insignificant "particular."

because the Agreement is silent on the specific subject of room reassignment, the Agreement must be read to <u>permit</u> such reassignment absent some explicit prohibition.  This argument must fail.

First and foremost, in light of the above textual analysis, the Court rejects the premise of Omni's argument.  Omni misstated the record when it declared that "[t]here is nothing in the Agreement that prohibits a reassignment of those spaces."  Omni SJ Reply at 13 (emphasis omitted).  The Agreement plainly states that if Omni sought to make "[a]ny changes" to the Agreement—which would presumably include changing the specific rooms Omni agreed to make available—those changes would need to be "approved in writing by both parties."  Agreement at 6.  Omni responded that it did not ignore that section of the Agreement; instead, it insisted again that "the Agreement did not prohibit Omni from reassigning the event spaces reserved for the 2019 Gala, <u>and it therefore required no alteration or modification</u>" that would require mutual written consent.  Omni SJ Reply at 18.  But this is nothing more than an effort to avoid the unambiguous text of the Agreement.  On its face, the Agreement provides for specific rooms, and the only way to reassign the event to different rooms would be to <u>alter</u> or <u>modify</u> those guarantees.

Further, even if the Court accepted Omni's argument that the Agreement is silent on reassignment, is does not follow that the Agreement is therefore ambiguous.  Courts "hold parties to the promises they articulate, without attempting to discern their unexpressed intentions."  <u>Dyer v. Bilaal</u>, 983 A.2d 349, 361 (D.C. 2009); <u>see</u> <u>Bragdon v. Twenty-Five Twelve Associates Ltd. Partnership</u>, 856 A.2d 1165, 1170 (D.C. 2004) ("[A] court must honor the intentions of the parties as reflected in the settled usage of the terms they accepted in the contract and will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." (internal quotation marks and citations omitted)).  For this reason, "courts generally do not imply terms into an agreement when the contractual language at issue is otherwise clear."  <u>Jacobson Holman, PLLC</u>

v. Gentner, 244 A.3d 690, 697 (D.C. 2021).  In fact, Omni's own briefing recognizes the minimal interpretive value of contractual omissions.  Omni wrote that "'[w]hen a [contract] is merely silent' on a question, 'courts seldom find ambiguity.'"  Omni SJ Reply at 13 (quoting Cason v. Nat'l Football League Players Ass'n, 538 F. Supp. 3d 100, 118 (D.D.C. 2021)); see id. (quoting Maryland v. Philip Morris, Inc., 123 A.3d 660, 678–79 (Md. Ct. Spec. App. 2015) for the proposition that "[a] contract's silence on a particular issue does not, by itself, create ambiguity as a matter of law").

Despite the unambiguous text of the Agreement, Omni seems to believe that room reassignments are somehow distinct from any other changes and that "the Agreement does not contain any express prohibition against reassigning event spaces."  Omni's Mem. of Law in Opp'n to Inova MSJ [ECF No. 64] ("Omni SJ Opp'n") at 18.  Although Omni protests "that Plaintiffs argue for a negative covenant to be read into the Agreement prohibiting Omni from acting in accordance with standard hotel-industry practice by reassigning certain events at the 2019 Gala to alternative, substantially equivalent spaces within the Hotel," id. at 21, the Court is not persuaded. It is Omni—not Inova—that asks the Court to insert an additional term into the Agreement—a term permitting reassignment of rooms without consent—despite the Agreement's broad requirement of mutual assent to any changes. Omni claims that this invisible provision derives from industry standard practices, but Omni itself conceded that "[e]vidence concerning trade custom may not be used to contradict the terms of an unambiguous contract."  Omni SJ Reply at 15 (internal quotation marks omitted).[10]

_____

[10] And even if Omni's preferred new term were supported by industry standard practice, it would appear to conflict with D.C. contract law, which is presumed to be incorporated into the Agreement.  See O'Malley v. Chevy Chase Bank, F.S.B, 766 A.2d 964, 969 n.6 (D.C. 2001) ("In general, contracts are construed to incorporate the law existing at the time of execution.").  Under D.C. law—and as a general principle of contract law—a "modification to a contract requires mutual consent of the parties."  Johnson v. Mercedes-Benz, USA, LLC, 182 F. Supp. 2d 58, 64 (D.D.C. 2002) (citing Rinck v. Ass'n of Reserve City Bankers, 676 A.2d 12, 17 (D.C. 1996); see also Whitney v.

Omni's argument makes even less sense upon testing its internal logic.  Omni maintains that the Agreement is effectively ambiguous because "[n]othing in the Agreement prohibited Omni from making . . . a reasonable reassignment of space," Omni SJ Opp'n at 24, and "nothing in the Agreement suggests that the 'Event Details' were so fundamental to the contract that they could not be modified without substantially changing the Agreement," id. at 23.  But the times of the Gala's events were also listed in the "Event Details" section, and—other than the prohibition on any changes without consent—the Agreement did not separately prohibit changing the time of the Gala.  Is the Agreement silent (and therefore ambiguous) on whether Omni could unilaterally change the time of the dessert reception from 10:00 p.m. to 4:00 p.m.?  Is it silent on unilaterally changing the date of the event—also listed in the "Event Details"—to another weekend?  Surely not.  All contracts are technically silent on many things, and they rarely impose express restrictions on specific types of changes when they instead broadly restrict any changes without consent.  But that does not invite a party to append an unwritten promise to permit unilateral modifications to a bargained-for aspect of the deal.

For these reasons, the Court rejects Omni's argument that the Agreement is silent as to room reassignment and that such silence could be interpreted to permit the Hotel to unilaterally reassign the Gala into event spaces other than those specified in the Agreement.  As written, the Agreement is unambiguous on this issue.

## B.  Extrinsic Evidence

The Court's conclusion that the Agreement is unambiguous does not necessarily end its analysis.  As noted above, under D.C. law, it may be that some extrinsic evidence is admissible to

---

Wyman, 101 U.S. 392, 396 (1879) ("The agreement thus made could not be afterwards changed by either of the parties without the consent of the other.").

provide context of the circumstances surrounding the Agreement's formation and to aid the Court in determining how a reasonable person in the position of the parties would have understood the Agreement's unambiguous language.[11]   The Court will first endeavor to explain D.C. law's "reasonableness inquiry" and then will review the extrinsic evidence presented by the parties.

1.   The Reasonableness Inquiry and the Use of Extrinsic Evidence

D.C. case law governing the "reasonableness inquiry" is admittedly confusing and, at times, directly conflicting.   "In deciding whether contract language is susceptible of a clear meaning," courts applying D.C. law "conduct[] a reasonableness inquiry" that requires them to "look[] beyond the language itself and determine[] what a reasonable person in the position of the parties would have thought the disputed language meant."   Potomac Elec., 251 F. Supp. 2d at 149.

One part of the "reasonableness inquiry" demands that courts "consider the intent of the parties in entering into the agreement."   Sagalyn v. Found. for Pres. of Historic Georgetown, 691 A.2d 107, 112 n.8 (D.C. 1997).   Whether the contractual language is ambiguous matters because it controls what evidence may be considered in determining the parties' intent: "[w]here the document is unambiguous, its language provides 'the best objective manifestation of the parties' intent,'" and D.C. courts have been very clear that "[e]xtrinsic evidence of the parties' subjective intent may be resorted to only if the document is ambiguous," id. (emphasis added) (quoting 1010 Potomac Assocs., 485 A.2d at 205); see Dyer, 983 A.2d at 355 ("[A] party's unexpressed intent is irrelevant if a contract is unambiguous."); see also Potomac Elec., 251 F.

---

[11] The Court recognizes that this description of the legal analysis seems bizarre: if the Agreement is unambiguous, what benefit does this extrinsic evidence really provide?  Even according to D.C. cases allowing such evidence, "[e]xtrinsic circumstances surrounding the execution of a contract may be considered only to aid in determining the meaning of the contract, not to alter its terms."   1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc., 485 A.2d 199, 207 n.11 (D.C. 1984).  Nevertheless, to remain faithful to D.C. law, the Court will consider this evidence and ultimately concludes that it simply bolsters the reasonable observer's conclusion that the Agreement does not permit unilateral reassignment of location.

Supp. 2d at 150 ("Courts should resort to extrinsic evidence of the parties' subjective intent only when the contract is ambiguous.").

Separately, the "reasonableness inquiry" also requires a court to review the circumstances surrounding the formation of the contract.  The D.C. Court of Appeals has explained that when "[u]sing this [reasonableness] approach, the objective reasonable person assessing the contract's language 'is presumed to know all the circumstances before and contemporaneous with the making of the agreement,' and extrinsic evidence is admissible to determine the nature of those circumstances."  Patterson v. Dist. of Columbia, 795 A.2d 681, 683 (D.C. 2002) (quoting Adler v. Abramason, 728 A.2d 86, 89 (D.C. 1999)) (citation omitted) (emphasis added), opinion amended in irrelevant part on denial of reh'g, 819 A.2d 320 (D.C. 2003).  Critically, "[t]his reasonableness determination involving an evaluation of the surrounding circumstances" as determined by extrinsic evidence "is to be applied whether the contract's language appears ambiguous or not." Id.

To reiterate, under D.C.'s traditional approach, a court interpreting an unambiguous contract is precluded from considering extrinsic evidence of the parties' subjective intent but is required to consider extrinsic evidence of the circumstances surrounding contract formation.  See Christacos, 583 A.2d at 194 ("[A]lthough extrinsic evidence of the parties' subjective intent may be resorted to only if the document is ambiguous, extrinsic evidence may be considered to determine the circumstances surrounding the making of the contract so that it may be ascertained what a reasonable person in the position of the parties would have thought the words meant." (cleaned up)).

Nevertheless, it appears that another concurrent line of decisions by the D.C. Court of Appeals seeks to reframe D.C. contract law to limit consideration of any extrinsic evidence—

including evidence of the surrounding circumstances—to only ambiguous contracts.  See Carlyle, 131 A.3d at 895 ("Where the contract language is not susceptible of a clear and definite meaning— i.e., where the contract is determined by the court to be ambiguous—external evidence may be admitted to explain the surrounding circumstances and the positions and actions of the parties at the time of contracting." (quoting Aziken v. Dist. of Columbia, 70 A.3d 213, 219 (D.C. 2013))); Rivers & Bryan, Inc. v. HBE Corp., 628 A.2d 631, 635 (D.C. 1993) ("[I]f a contract is determined by the court to be ambiguous, then external evidence may be admitted to explain the surrounding circumstances and the positions and actions of the parties at the time of contracting.").[12]

Although it remains unclear which approach should govern, the Court need not decide for the purposes of this case.  Cf. Abdelrhman, 76 A.3d at 889 ("We need not attempt in this case to harmonize our various decisions because we reach the same conclusion regardless of our approach.").  Upon reconsideration, the Court has concluded that the language of the contract, standing alone, is unambiguous.  Further, as the Court will describe now, reviewing extrinsic evidence of "all the circumstances before and contemporaneous with the making of the agreement" confirms that "a reasonable person in the position of the parties would have" construed the

_____

[12] At least one other federal court has openly struggled to grapple with these conflicting lines of cases.  See In re Linton Props., LLC, 410 B.R. 1, 9–10 (Bankr. D.D.C. 2009).  The well-intentioned Linton court decided that it would "not attempt to reconcile the seeming conflict in District of Columbia case law, and w[ould] assume that the more recent decision . . . is the correct statement of law."  Id. at 10.  At that time, the "most recent decision" was Akassy v. William Penn Apartments Ltd. Partnership, 891 A.2d 291 (D.C. 2006), a case that adhered to the approach permitting consideration of extrinsic evidence of surrounding circumstances when interpreting an unambiguous contract, Akassy, 891 A.2d at 298–99.  As reasonable as the Linton court's approach seemed, it was not a successful prediction; the D.C. Court of Appeals subsequently applied the conflicting approach in at least one decision after Linton was decided.  See Carlyle, 131 A.3d at 894–95.

In fact, the D.C. Court of Appeals has recognized that "confusion sometimes arises" based on the fact that some of its contract cases "have allowed more liberal use of extrinsic evidence" than others.  Abdelrhman, 76 A.3d at 888–89 (internal quotation marks omitted).  Rather than resolve that confusion, however, the Abdelrhman court simply avoided the issue by stating that it would reach the same outcome under either approach.  Id. at 889.

Agreement in accordance with its unambiguous meaning.  Patterson, 795 A.2d at 683 (internal quotation marks omitted).

### 2.  Evidentiary Analysis

Assuming for the sake of analysis, then, that the Court must consider extrinsic evidence of surrounding circumstances, it concludes that a reasonable person in the position of the parties would find that such evidence bolsters the unambiguous meaning of the Agreement.  There is no genuine dispute as to material extrinsic evidence that could disturb that determination.

D.C. cases appear to consider a wide range of evidence under the broad umbrella of "surrounding circumstances," so long as it is not extrinsic evidence of subjective intent.  Here, the parties present several considerations that could be characterized as "surrounding circumstances," including the parties' prior negotiations, the routine practices of Omni, and—of course—the hotel industry's standard practices regarding room reassignment.  The Court will now consider this evidence.

The first thing that both parties would have known is "the circumstances before" the making of the 2019 Agreement, Patterson, 795 A.2d at 683, which include the negotiation of the contract for the first iteration of the Gala held at the Hotel in 2013.  The record shows that Hisaoka—who negotiated each Gala contract between plaintiffs and Omni from 2013 to 2019, see Inova, 2022 WL 4598578, at *1—"insisted, while negotiating the contract for the 2013 Gala . . . that Omni's standard provision reserving to Omni the right to reassign the Gala from the Ambassador and Regency ballrooms to other space be deleted from that contract."  Inova SUMF ¶ 27; see Omni SDF at 3 (not disputing the substance of this fact but only generally arguing that "[e]vidence concerning contract negotiations preceding the Agreement's execution is barred under the parol evidence rule"); see also Inova MSJ Ex. A [ECF No. 63-3] ("Hisaoka Aff.") ¶¶ 8, 18–19

(attesting that, based on an unwanted reassignment of rooms at a previous hotel hosting the Gala, Hisaoka insisted on deleting Omni's standard provision reserving to Omni the right to reassign the 2013 Gala); Inova MSJ Ex. E [ECF No. 63-7] ("Inova's Sanchez Dep. Tr.") at 22:24–24:4 (testifying that the room-reassignment provision "was one of the items that was struck out" from the 2013 Gala Agreement).

On a related note, an objective, reasonable person in the parties' position would know that Omni had a standard practice of including an "express reservation of the right by Omni to reassign the space identified in the 'Event Details' section of the letter agreement," and that such a term "is always initially contained in every contract prepared by Omni, but it may be modified or excised entirely from the contract during negotiations with the client."  Inova SUMF ¶¶ 23, 25; see Omni SDF at 3 (raising no substantive dispute); see also, e.g., Inova MSJ Ex. I [ECF No. 63-11] ("Inova's Darrow Dep. Tr.") 62:1–5, 10–15 (testimony from Omni's former senior catering manager that "in every contract that [she] had . . . [t]here [was] usually a clause that indicates that the hotel has the right to move events as needed," which she thought was "standard for hotel contracts").  The reasonable observer would also know that Omni's standard reassignment provision is frequently stricken from contracts for "social catering events" like galas and weddings, given the importance of specific event spaces to those types of clients.  Inova SUMF ¶ 26 & n.6; see Omni SDF at 3 (raising no substantive dispute); see also, e.g., Inova's Sanchez Dep. Tr. 24:25–25:3, 25:20–26:2 (testimony from another former senior catering manager that "I can't tell you how many times I struck out that clause or changed it to written permission because my catering clients, especially galas and weddings, . . .  they buy the name of the room" and "Omni Shoreham has very, very unique ballrooms" which are "the selling point" to "gala clients"); id. at 26:3–6 ("[O]n the catering side, you're going to see that clause stricken probably 90 percent of the time . . .

."); Inova's Darrow Dep. Tr. 62:16–21 (testifying that brides sometimes "insist[] that that standard provision on the right to reassign be deleted . . . for obvious reasons").

Importantly, the reasonable observer would know how Omni handles room reassignment in practice.  The record shows that—as best as any testifying employee can remember—Omni always obtained consent before moving a gala event.  Omni's Rule 30(b)(6) corporate representative Mark Roche-Garland "d[id not] recall" "any instance where [Omni] has reassigned space otherwise contracted for . . . a gala, over the objection of the customer."  Inova MSJ Ex. G [ECF No. 63-9] ("Inova's Roche-Garland Dep. Tr.") 44:8–12, 18.  Robert Yienger, Omni's director of sales and marketing, testified that, in his experience, "every time [Omni has] needed to reassign space, we have gotten the client's consent."  Inova MSJ Ex. K [ECF No. 63-13] ("Inova's Yienger Dep. Tr.") 201:24–202:2.  Michael Schneider, who served as Omni's director of catering, similarly stated that he was "not aware" of "any instance where the Omni, without the consent of the customer, unilaterally reassigned event space that had been contracted for."  Inova MSJ Ex. H [ECF No. 63-10] ("Inova's Schneider Dep. Tr.") 189:2–6.

Moreover, this regular practice of declining to reassign rooms without a client's consent was especially important when a contract had been modified to omit Omni's standard reassignment provision.  Susan Darrow, Omni's former senior catering manager, testified that she had "never heard of" Omni "reassign[ing] a gala event" to a different space "without the consent of a client . . . when the contract didn't expressly reserve the right of the hotel to do that."  Inova's Darrow Dep. Tr. 87:2–9.  David Magsumbol, who formerly served as Omni's director of catering, also testified that he "personally" had never dealt with another instance where "the hotel reassigned the space over the objection of its customer" and the contract did not "contain a provision reserving the right to reassign the space."  Inova MSJ Ex. M [ECF No. 63-15] ("Inova's Magsumbol Dep.

Tr.") 173:22–174:4.  Finally, Dominic Sanchez, a former senior catering manager at Omni, averred that a situation "never happen[ed]" during his tenure in which "Omni entered into a contract that did not contain a provision reserving the right to reassign the space but the hotel nonetheless reassigned the space over the objection of its customer."  Inova's Sanchez Dep. Tr. 136:19–137:4.[13]

When considered cumulatively, this evidence indicates that Omni's regular practice was to obtain customer consent to room reassignment in two ways: (1) through affirmative customer consent to specific rooms changes when a need arose, and (2) by obtaining customer consent in advance via Omni's standard contract term affirmatively permitting reassignments.  In large part, Omni concedes that these statements demonstrate that its employees have no "personal knowledge of instances at Omni where reserved rooms had been reassigned without a customer's agreement," Opp'n to Mot. for Recons. at 11; see id. at 7, 12–13, 18, and that "it was usual to include a clause in the written agreement expressly reserving the right to reassign event spaces," id. at 14.  Still, Omni makes a few unsuccessful efforts to counter these employees' statements regarding the Hotel's routine reassignment practices.

First, Omni points to conflicting testimony from one employee that suggests a different standard practice by Omni.  See Opp'n to Mot. for Recons. at 16–18.  Magsumbol, the then-director of catering, testified that he expressed concern to Yienger, Omni's director of sales and marketing, that the Agreement omitted the standard "reservation of rights to relocate the space

---

[13] Plaintiffs argue in their motion for reconsideration that these statements are "unequivocal proof of the hotel-industry standard on room reassignment."  Opp'n to Mot. to Recons. at 10.  As Omni notes, however, this testimony says very little about whether "the industry standard was only to reassign rooms with a customer's consent," id. at 6; rather, these statements are evidence that—as far as these deponents can recall—Omni has not previously taken reassignment actions unilaterally, regardless of how the rest of the industry typically acts.  Yet, as the Court now notes, this evidence of Omni's standard practices is far more important to understanding what "a reasonable person in the position of the parties would have thought the [Agreement's] words meant," Christacos, 583 A.2d at 194 (internal quotation marks omitted), than an industry-wide standard that Omni may or may not follow.

provision."   Omni MSJ Ex. 9 [ECF No. 62-11] ("Omni's Magsumbol Dep. Tr.") 102:5–9.

Magsumbol explained his recollection that "it was[,] in [Yienger's] opinion, . . . understood . . .

that we always reserved the right," which he did not question because Yienger "kn[ew] more than

[he did]."  Id. 102:15–20.  In other words, Magsumbol "understood Mr. Yienger to be of the view

that even though that reservation of rights to reassign space provision was not in the gala contract,

the hotel had a right to reassign the space . . . because it was the hotel's standard practice to do that

when the need arose."  Id. 102:21–103:6 (emphasis added).[14]  Given Yienger's alleged insistence,

Magsumbol was "sure they did it before," id. 103:8—i.e., that Omni had unilaterally reassigned a

room despite a contract's omission of the standard reassignment provision.

Normally, conflicting testimony could raise a genuine dispute of material fact that would

preclude summary judgment, but the Court concludes that it does not here.  Importantly,

Magsumbol's conflicting testimony is not about his own knowledge of Omni's standard practices;

rather, it is his recollection of Yienger's opinion, which Magsumbol did not question.  See Inova's

Magsumbol Dep. Tr. 100:18–25, 101:5–7 (testifying to Mr. Yienger's opinion that the omission

of the reassignment provision was "irrelevant" because there was "no obligation that we couldn't

move the space," and noting, "I don't know where he got that from . . . [but] if he wasn't going to

worry about it, then I wasn't going to worry about it").  However, Magsumbol's recollections

directly conflict with testimony from Yienger himself that Inova's 2019 Gala is the only instance,

to his knowledge, "where the hotel has reassigned space that had been previously contracted for

---

[14] Given Omni's position that room reassignment is only prohibited when a contract explicitly says so, Omni is forced to insist that its standard inclusion of a clause reserving a right of reassignment is superfluous.  See, e.g., Opp'n to Mot. for Recons. at 19 ("[H]otels generally reserve the right to reassign reserved event spaces, irrespective of whether a written agreement pertaining to the reserved space expressly reserves that right.  Even if there is no such express term in the agreement, the standard industry practice remains the same even without a customer's . . . consent, provided that the agreement does not include any terms expressly prohibiting such a reassignment." (emphasis omitted)).  The Court is highly skeptical of this position, which implies that the parties' intentional removal of an unwanted provision from the 2013 version of the Gala agreement (and its omission from all subsequent gala agreements) had absolutely no effect on Omni's contractual obligations.

without the client's consent."  Inova's Yienger Dep. Tr. 201:17–202:2; see also id. 38:9–39:9 (testifying that he had not, in fact, "seen at Omni" any contracts "that expressly preclude the reassignment of event space").  Thus, despite Magsumbol's recollections of Yienger's opinions, the record still shows that neither employee has personal knowledge of Omni ever unilaterally reassigning event spaces.  Accordingly, this testimony is insufficient to create any genuine dispute of fact about Omni's regular practices.

Second, as the Court has alluded, Omni claims that other evidence suggests the existence of an industry-wide standard under which hotels are permitted "to reassign reserved event spaces so long as its agreement with a customer does not expressly prohibit such a reassignment."  Opp'n to Mot. for Recons. at 9 (emphasis omitted).  This issue—whether the standard practice in the hotel industry allows for reassigning event spaces unilaterally or only with customer consent—is at the heart of the parties' briefing on the motion for reconsideration, and both plaintiffs and Omni claim that the record contains undisputed evidence that demands judgment in their favor.  In the Court's view, both parties overstate the strength of the evidence in favor of their preferred industry standard.  As explained above, the testimony to which plaintiffs point explains how Omni handles room reassignments, but it does not directly address what the rest of the hotel industry does.  And at most, Omni's rebuttal evidence includes a few conclusory statements and implications of an industry standard of unilaterally reassigning event spaces, but nothing that Omni points to suggests that it has ever followed that alleged standard (even assuming it exists).

On its own terms, Omni's evidence is weak.  Outside of the previously addressed statements by Magsumbol, Omni's best evidence are a few statements by Roche-Garland which Omni claims "firmly established the hotel industry's standard practice."  Opp'n to Mot for Recons. at 7.  In some statements, Roche-Garland explained that because "the contract is silent on [the right

of reassignment], . . . [Omni's] belief [was] that it permitted us . . . to move the event to an alternate space." Omni MSJ Ex. 7 [ECF No. 62-9] ("Omni's Roche-Garland Dep. Tr.") 55:15–19. But that assertion—which primarily restates Omni's litigation position and does not actually offer any proof of an industry-wide standard—is impermissible extrinsic evidence of unstated <u>intent</u>. That is, Roche-Garland's attempt to explain that Omni omitted any contract term addressing room reassignment based on an intent to allow reassignment of event spaces is irrelevant because the contract is facially unambiguous. <u>See</u> <u>Dyer</u>, 983 A.2d at 355 ("[A] party's unexpressed intent is irrelevant if a contract is unambiguous.").

In another declaration, Roche-Garland averred (without further support) that "[i]t is standard practice within the hotel industry for hotels to reassign event spaces that have been reserved by clients for particular functions if a business need arises." Omni's Mem. of Law in Opp'n to Inova MSJ Ex. C [ECF No. 64-4] ("Roche-Garland Decl.") ¶ 9. The import of this additional testimony is not as "<u>clear</u>[]" as Omni suggests, Opp'n to Mot. to Recons. at 9—on its face, Roche-Garland's conclusory statement omits the crucial issue of whether that alleged industry standard requires customer consent. Yet, taking the evidence "in the light most favorable to" Omni, a finder of fact could "justifiabl[y]" infer that Roche-Garland's statements implicitly refer to reassignment <u>without</u> customer consent. <u>Cauthen v. Dist. of Columbia.</u>, 459 F. Supp. 3d 134, 140 (D.D.C. 2020).

Nevertheless, even if Omni could muster enough evidence to raise a genuine factual dispute about the nature of the industry-wide standard, the Court now concludes that such a dispute is not material in light of undisputed evidence about how <u>Omni</u> routinely handles room reassignment. It is entirely plausible that, in a different case, the industry-wide standard could impact "what a reasonable person in the position of the parties would have thought the words meant." <u>Christacos</u>,

583 A.2d at 194 (internal quotation marks omitted).  But here, even if other hotels unilaterally reassign rooms absent an express prohibition, an objective reasonable person in the parties' position would know that Omni does not do that.  Upon reconsideration, the Court thus concludes that the industry-wide standard is immaterial in light of uncontroverted statements by Omni employees uniformly demonstrating that Omni's regular practice was to obtain customer consent before moving an event, especially (as here) when the contract did not expressly permit room reassignment—and even more especially when that provision was removed from the contract at Inova's insistence.

To summarize, an objective observer would know (1) that Omni usually requires event customers to agree to a standard contractual term granting Omni an express right to reassign rooms; (2) that Inova insisted on—and Omni agreed to—excising that standard term when they first held the Gala at the Hotel in 2013; and (3) that regardless of what the rest of the hotel industry does, Omni's regular practice is to obtain customer consent prior to reassigning rooms, especially when a contract omits Omni's standard room reassignment provision.  Given these surrounding circumstances, a reasonable person in the position of the parties would understand the Agreement—which unambiguously reserves specific rooms and states that any changes require mutual agreement—to preclude Omni from unilaterally reassigning the Gala's event spaces.

\*   \*   \*

Accordingly, regardless of whether extrinsic evidence of the surrounding circumstances should be considered to interpret the otherwise unambiguous portions of the Agreement relevant here, the same outcome results.  The Agreement unambiguously required Omni to hold the Gala in the specified rooms, and Omni breached the Agreement when it refused to hold the Gala in those spaces without obtaining Inova's consent.  Hence, the Court grants partial summary

judgment to plaintiffs on that ground.

### C.  Material Breach

Based on the Court's reconsideration of plaintiffs' breach of contract claim, it now concludes that Omni breached the Agreement by failing to hold the Gala in the contractually required spaces.  However, the issue remains whether Omni's breach was material.  The Court determines that it was.

When a party has "a number of obligations under [a] contract . . . , some of which it fulfilled, some of which it allegedly breached, . . . it may be uncertain whether any given breach was a nonperformance of duty so material and important as to justify the injured party in regarding the whole transaction as at an end." Keefe Co. v. Americable Int'l, Inc., 755 A.2d 469, 475 (D.C. 2000) (internal quotation marks omitted).  A breach is material "only if it relates to a matter of vital importance or if it goes to the essence [of the contract] and frustrates substantially the purpose for which the contract was agreed to by the injured party." Kriesch, 931 F. Supp. 2d at 253 (internal quotation marks omitted).

> Courts consider a range of factors in evaluating whether a breach was material, including the extent to which plaintiff will be deprived of the benefit which he reasonably expected under the contract; the extent to which the plaintiff can be adequately compensated for the part of that benefit of which he will be deprived; . . . the extent to which the behavior of the defendant comports with standards of good faith and fair dealing[;] . . . [and] whether the breach was willful rather than by negligence or by extraneous circumstances . . . .

Id. (internal quotation marks omitted).  "[T]he materiality of a breach of contract is not always a question of fact, even if the issue is disputed; thus, if there is only one reasonable conclusion, a court must address what is ordinarily a factual question as a question of law." America v. Preston, 468 F. Supp. 2d 118, 122 (D.D.C. 2006) (quoting 23 Williston on Contracts § 63.3 (4th ed.)).

The Court concluded in its prior summary judgment decision that it could not "determine 'the extent to which [plaintiffs were] deprived of the benefit which [they] reasonably expected'" by the relocation of the Gala, Inova, 2022 WL 4598578, at *13 n.12 (quoting Kriesch, 931 F. Supp. 2d at 253), noting that "[a]bsent a clear understanding of the relative weights of a party's obligations and other factors, it may be uncertain whether any given breach was a nonperformance of duty 'so material and important as to justify the injured party in regarding the whole transaction as at an end,'" id. (quoting Keefe Co., 755 A.2d at 475).  However, upon reconsideration of the parties' obligations and expectations, the Court now reaches a different conclusion.

As evidenced by the preceding discussion, there is little doubt that, under the plain terms of the contract, Inova "reasonably expected under the contract" that they would receive "the benefit" of a Gala held in the Ambassador and Regency ballrooms.  Kriesch, 931 F. Supp. 2d at 253 (internal quotation marks omitted).  Moreover, the record is clear and undisputed that those specific room assignments were particularly significant to Inova's assent to the Agreement.  As discussed, when the parties negotiated the contract for the first iteration of the Gala held at the Hotel in 2013, Hisaoka "insisted . . . that Omni's standard provision reserving to Omni the right to reassign the Gala from the Ambassador and Regency ballrooms to other space be deleted from that contract."  Inova SUMF ¶ 27; see Omni SDF at 3 (not disputing the substance of this fact); see also Hisaoka Aff. ¶¶ 8, 18–19 (attesting that this demand was made due to prior unwanted reassignment of rooms by a previous hotel that hosted the Gala).  Every Gala since 2013 has been held in those same rooms, see Inova SUMF ¶ 19 & n.3, and the 2013 Gala contract served as the basis for the 2019 Agreement at issue in this case, see Inova, 2022 WL 4598578, at *12.  Thus, plaintiffs specifically bargained for the inclusion of these particular event spaces and the omission of a routine contractual term that would have allowed Omni to relocate those spaces.

The vital importance of the room assignments was well understood by Omni.  For example, the Senior Catering Manager who drafted the first iteration of the Gala contract explained that Omni's standard contract was "modified" for plaintiffs "because [Omni] kn[ew] that that space was the space that [Inova] wanted and [Inova] would not want to change that space up."  Inova Sanchez Dep. Tr. 24:15–19; see id. 46:17–20 (agreeing that "as drafter of the" 2013 Agreement, Sanchez considered the assigned rooms "to be material, central, or important to the contract").  The significance of these spaces to Inova was similarly recognized by the Omni employee who prepared and executed the 2019 Agreement, Michael Schneider.  See Inova's Schneider Dep. Tr. 127:8–22 (agreeing that "the reference to the ambassador and regency ballrooms [were] important terms of the contract" because "Mr. Hisaoka requested it . . . [a]s he has done in the prior several years" and those rooms are "their main ballroom space" and "[t]heir main function space").

Nor was it unique that Inova considered the specific room assignments to be essential to the Agreement.  As explained, gala and wedding clients frequently demand that Omni strike its standard reassignment provision given the importance of specific event spaces to those types of clients.  Inova SUMF ¶ 26 & n.6; see Omni SDF at 3 (not substantively disputing that fact); see also, e.g., Inova's Sanchez Dep. Tr. 26:3–6 ("[O]n the catering side, you're going to see that clause stricken probably 90 percent of the time . . . ."); Inova's Darrow Dep. Tr. 62:16–21 (testifying that wedding clients sometimes "insist[] that that standard provision on the right to reassign be deleted . . . for obvious reasons").  The original contract drafter expressed that he "[couldn't] tell you how many times [he] struck out that clause or changed it to written permission, . . . especially [for] galas and weddings," because "[those clients] buy the name of the room," given that "Omni Shoreham has very, very unique ballrooms" that are often "the selling point" for those types of clients.  Inova's Sanchez Dep. Tr. 25:20–26:2.

Thus, the location of the Gala was "a matter of vital importance" to Inova, and accordingly, Omni's breach—unilaterally changing the event space without consent—"frustrate[d] substantially the purpose for which the contract was agreed to by" Inova. Kriesch, 931 F. Supp. 2d at 253 (internal quotation marks omitted).

Moreover, Inova's expected benefit—use of the Ambassador and Regency Ballrooms—was singular and concrete, and therefore the deprivation of that benefit was not something for which plaintiffs could be "adequately compensated" by reassigning the Gala to other distinct rooms. Kriesch, 931 F. Supp. 2d at 253. The bulk of Omni's argument is focused on this point; Omni primarily insists that its breach was not material because "[t]he alternate rooms and enhanced services that Omni offered for the 2019 Gala" would have "ma[d]e the 2019 Gala an even better event than the Gala had been in past years" and thus were adequate alternatives. Omni MSJ at 34–35; see id. (arguing that "[t]he Blue Room ha[d] . . . ample space for the 2019 Gala's dinner" and "boasts a proud history of hosting prominent social events attended by Washington's social elite" and that "[t]he Roberts Restaurant, too, is an elegant room" with more than sufficient capacity); see also Omni SJ Opp'n at 30–31. In its prior Opinion, the Court mistakenly placed too much emphasis on this argument. See Inova, 2022 WL 4598578, at *13 n.12 (noting that "it could be that the reassigned spaces were equally suitable to host the Gala" or "[i]t could also be the case that the rooms were so inadequate or such a downgrade from the expected, and agreed-upon, facilities that the reassignment substantially deprived plaintiffs of the benefit of the Agreement," and concluding that "the Court cannot weigh the evidence of the rooms' suitability at summary judgment"). But in determining whether a material breach occurred, the Court's focus is not whether plaintiffs are able to marshal "quantifiable evidence . . . that reassigning the Gala to those spaces would have adversely affected the Gala." Omni SJ Reply at 20 (emphasis omitted). Rather,

the Court can easily determine based on undisputed facts in the record that Inova's insistence on the exclusive use of specific event spaces was "a matter of vital importance" and that Omni's denial of that promised benefit "frustrate[d] substantially the purpose for which the contract was agreed to by the injured party." Kriesch, 931 F. Supp. 2d at 253 (internal quotation marks omitted).[15]

In addition to Omni's awareness of the importance of the Ambassador and Regency Ballrooms to Inova, all relevant evidence suggests that Omni's "breach was willful rather than by negligence or by extraneous circumstances." Kriesch, 931 F. Supp. 2d at 253. Omni's reason for reassigning space was simply to accommodate an event hosted by a higher-paying client: after Omni had already agreed to host the Gala in the specified rooms, it unilaterally reassigned those rooms without Inova's consent to free up those spaces for an event hosted by the Embassy of Lebanon, which would bring in more than three times as much revenue. Inova SUMF ¶ 74 ("Omni expected the Embassy event to generate for the Hotel over $374,000 in revenue, which was more than three times the $106,000 in revenue that was projected for the Gala."); see Omni SDF (not responding to, let alone disputing, this fact). Omni admits that "[t]he facts of record show that [it] acted . . . in an effort to accommodate both Plaintiffs and the Embassy by making the best and most efficient use of its Hotel space." Omni SJ Opp'n at 33. In making such an admission, Omni has effectively conceded that its decision to reassign the space was not driven by negligence or by

---

[15] This analysis should not be read to suggest that the breach of any term of a contract is material solely because the record indicates that a party had a subjective preference for that term. Such a rule would lead to findings of a material breach in far more cases than warranted. For example, the Agreement also called for "Tableside Coffee and Tea Service" with dinner. Agreement at 5. If Omni only provided a self-serve coffee and tea station, the Court doubts that breach would be material, even if Inova strongly preferred tableside service. There would be no evidence the breach "frustrate[d] substantially the purpose for which the contract was agreed to by [Inova]." Kriesch, 931 F. Supp. 2d at 253 (internal quotation marks omitted). But here, the uncontroverted evidence establishes that Inova entered this Agreement not just for the purpose of holding a Gala, but rather for the purpose of holding a Gala in these specific rooms. That is, use of the Ambassador and Regency Ballrooms was a large part of "the purpose for which the contract was agreed to by [Inova]." Id.

extraneous circumstances, but rather that it intentionally and willfully breached a contractual term in an effort to pursue a more lucrative opportunity while holding on to Inova's business.[16]

Hence, based on undisputed facts in the record, the Court can conclude that the "evidence on materiality of the alleged breach is . . . 'so one-sided that [Inova] must prevail as a matter of law.'" 3511 13th St. Tenants' Ass'n v. 3511 13th St., N.W. Residences, LLC, 922 A.2d 439, 445 (D.C. 2007) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).  Accordingly, the Court will grant summary judgment to plaintiffs on their breach of contract claim.

## II.   Inova's Claim that Omni Breached the Covenant of Good Faith and Fair Dealing

Given the Court's reconsideration of Inova's breach of contract claim, the Court must also revisit Inova's claim that Omni breached the implied covenant of good faith and fair dealing.  The Court concludes that plaintiffs are entitled to summary judgment on this claim, as well.

Under D.C. law, "[a]ll contracts contain an implied covenant of good faith and fair dealing, which prevents either party from doing anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Mero v. Segway Tours of Wash., D.C., LLC, 826 F. Supp. 2d 100, 106 (D.D.C. 2011) (cleaned up).  "If the party to a contract evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party, he or she may be liable for breach of the implied covenant of good faith and fair dealing." Allworth v. Howard Univ., 890 A.2d 194, 201 (D.C. 2006) (internal quotation marks omitted).  The D.C. Court of Appeals has explained that "[t]he phrase 'good faith' . . . emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving

---

[16] For the reasons discussed infra Section II, the Court also concludes that Omni's behavior does not "comport[] with standards of good faith and fair dealing," Kriesch, 931 F. Supp. 2d at 253 (internal quotation marks omitted), which further supports a finding of a material breach.

'bad faith' because they violate standards of decency, fairness or reasonableness."  Id. at 201–02 (quoting Restatement (Second) of Contracts § 205 cmt. a).  Bad faith "may be overt or may consist of inaction," but it "means more than mere negligence."  Id. at 202 (internal quotation marks omitted).  "'[F]air dealing' involves reasonable rather than arbitrary or capricious action," and "fair dealing may require more than honesty."  Id. at 202 (internal quotation marks omitted).

In its prior Opinion, the Court reasoned that the same "factual disputes" that it thought precluded determining whether Omni's breach of contract was material—namely, "whether the reassigned rooms were a 'reasonable' alternative to the Ambassador and Regency Ballrooms"— also "preclude[d] resolution of plaintiffs' claim for breach of the implied covenant of good faith and fair dealing."  Inova, 2022 WL 4598578, at *14.  That is

> [i]f the reassignment had the effect of destroying or injuring plaintiffs' right to receive the fruits of the contract, then plaintiffs may be able to prove that Omni breached the implied covenant; [but] if the reassignment did not interrupt plaintiffs' justified expectations, then Omni may not be liable for breach on this count.

Id. (internal quotation marks and citations omitted).  The Court concluded that "without weighing the evidence, which [wa]s inappropriate at th[at] stage, the Court [could not] resolve the parties' cross-motions."  Id.  Now that the Court has reconsidered the Agreement's terms and the relevant undisputed evidence, it has determined that it is irrelevant for finding a material breach whether the reassigned rooms were a reasonable alternative because Inova reasonably expected that Omni would host the Gala in its specifically bargained-for event spaces.  Hence, the Court must also reconsider whether to grant summary judgment on plaintiffs' implied covenant claim.

As explained, the undisputed facts in the record show that Omni contracted to host Inova's Gala in specific rooms and that the Agreement required that "[a]ny changes"—which would include a relocation of the event—"w[ould] not be considered agreed to or binding unless . . . approved in writing by both parties."  Agreement at 6.  Several months later, Omni entered into a

separate contract for another, more lucrative event in those same rooms, and then informed plaintiffs that the Gala would be moved and refused to reconsider that decision over plaintiffs' express objections.[17]  Omni admits that "[t]he facts of record show that Omni acted . . . in an effort to accommodate both Plaintiffs and the Embassy," Omni SJ Opp'n at 33, but, as the Court has already explained, the specific room assignments were clearly essential to Inova's assent to the Agreement, and Omni deliberately deprived Inova of that bargained-for benefit to give the spaces to a higher-paying client and increase its overall profits.

In response, Omni claims that the record indicates that it acted in good faith because "it took into account the Gala's expected attendance and the size and capacity of the rooms to which Omni reassigned it, . . . offered to upgrade the 2019 Gala's menu and to provide the Gala with outdoor tenting at no cost to Plaintiffs," and did so "in order to accommodate the larger space needs of the Conference and to ensure that the 2019 Gala would be a really wonderful event[] and better than what was done in the past.'"  Omni MSJ at 37 (cleaned up).  Although Omni's efforts to minimize the ramifications of its breach may have been well intentioned, it does not necessarily follow that its initial decision to breach the Agreement was made in good faith.  As previously explained, the "full benefit of [the] bargain" was not just "an elegant gala, hosted in some of the Hotel's most luxurious and storied event spaces," id. at 37–38 (emphasis added)—it was a Gala

---

[17] Omni entered the Agreement with plaintiffs on December 14, 2018.  Inova, 2022 WL 4598578, at *2.  In June 2019, a representative of the Embassy of Lebanon contacted Omni to inquire about hosting a large event at the Hotel during the same time as Inova's Gala.  Omni SUMF ¶ 20; see Inova SUMF ¶ 64.  Given the size of the proposed Embassy event, it could only be held in event spaces that were already guaranteed to be reserved for the Gala.  Omni SUMF ¶ 26; see Inova SUMF ¶¶ 73, 75.  Although Omni confirmed that the Regency and Ambassador ballrooms were reserved for the Gala, Omni decided to relocate the Gala to alternate spaces to accommodate the Embassy event, and—on July 8, 2019—it entered into a contract with the Embassy to host its event.  Omni SUMF ¶¶ 30, 36–37; see Inova SUMF ¶¶ 67, 73, 77–80.  It was not until that same day, July 8, 2019, that Omni informed plaintiffs "that the Hotel had relocated, or was planning to relocate, the Gala from the Ambassador and Regency Ballrooms to alternative spaces at the Hotel (the Roberts Restaurant and the Blue Room)."  Inova, 2022 WL 4598578, at *2.  On July 9, 2019, plaintiffs—through counsel—"demanded that Omni reverse its decision to relocate the Gala," but on July 11, Omni "declined to rescind its reassignment decision."  Id.

hosted in very specifically selected event spaces.  Omni similarly argues that it engaged in "fair dealing" because

> [t]he facts of record show that Omni acted reasonably in an effort to accommodate both Plaintiffs and the Embassy by making the best and most efficient use of its Hotel and, indeed, selecting alternate event spaces for the 2019 Gala that would have improved the experience for the Gala's guests.

Id. at 38.[18]  But this obscures the fact that Omni willfully offered to the Embassy—and ultimately entered into a contract with the Embassy for—event spaces that were already contractually reserved for the Gala, and did so without informing or seeking prior approval from Inova.  It may be that Omni truly believed that it could "make the Gala a better event than it had been in the past," id. at 39, while also accommodating the high-paying Embassy event, but that does not change the fact that Omni "evade[d] the spirit of the contract" and "willfully render[ed] imperfect performance," Mero, 826 F. Supp. 2d at 106 (internal quotation marks omitted), by booking a more lucrative event in the spaces that were already reserved for Inova, without seeking Inova's approval as required by the Agreement.

Accordingly, upon reconsideration, the Court will grant summary judgment to plaintiffs on their claim that Omni breached the implied covenant of good faith and fair dealing.

## III.   Omni's Breach of Contract Counterclaim

Omni asserts a counterclaim alleging that Inova was responsible for cancelling the Gala and failed to pay Omni the contractually mandated amount of liquidated damages.  See Inova,

---

[18] Omni also emphasizes that "Mr. Hisaoka . . . had never even seen the Blue Room, had no idea of its seating capacity, and only a vague and inaccurate idea of the seating capacity of Roberts Restaurant."  Omni MSJ at 39.  But this argument misses the point.  As the Court has explained, given the vitality of the specific event spaces to Inova's assent to the Agreement, it is not particularly relevant whether the alternate spaces were, in fact, adequate alternatives.  That is, it is not clear to the Court why it would matter that Hisaoka had not viewed alternative spaces given that Omni was already locked into a binding contract with Inova to hold their Gala in the Ambassador and Regency ballrooms and, under the Agreement, Inova could have rejected Omni's request to relocate the event whether or not the new rooms were adequate alternatives.

2022 WL 4598578, at *13.  In its prior Opinion, the Court explained that it could not "conclude whether Inova breached the Agreement by failing to pay liquidated damages" because that would depend on (1) whether Omni breached the Agreement by reassigning rooms, and (2) if so, whether that breach was material.  Id.  However, upon reconsideration, the Court has now concluded that Omni did breach the Agreement and that Omni's breach was material.  Accordingly, Inova was excused from its contractual obligation to pay liquidated damages.  See id. (noting that, if Omni materially breached the Agreement, that "would excuse Inova from its future performance under the Agreement").  For this reason, the Court will grant summary judgment to plaintiffs on Omni's counterclaim for breach of contract.

## Conclusion

For the foregoing reasons, the Court will grant plaintiffs' motion for reconsideration.  The Court will grant summary judgment to plaintiffs on their breach of contract claim and concludes that (1) the Agreement unambiguously required Omni to hold the Gala in the contractually specified rooms absent plaintiffs' consent to any changes, (2) Omni breached the Agreement by reassigning the Gala to alternative event spaces without such consent, and (3) Omni's breach was material.  The Court will also grant summary judgment to plaintiffs on their claim for breach of the implied covenant of good faith and fair dealing.  Finally, the Court will grant summary judgment to plaintiffs on Omni's counterclaim for breach of contract.  A separate Order to this effect shall issue on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: August 14, 2023