UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **INOVA HEALTH CARE SERVICES, FOR INOVA FAIRFAX HOSPITAL AND ITS DEPARTMENT, LIFE WITH CANCER, et al.,**<br><br>    **Plaintiffs,**<br><br>        v.<br><br>**OMNI SHOREHAM CORP.,**<br><br>    **Defendant.** | **Civil Action No.  20-784 (JDB)** |

### MEMORANDUM OPINION

Months ago, this Court "surmise[d] that the total for five years of legal fees" the plaintiffs to this case had shouldered "exceeds the $203,102.10 [they] will recover from" defendant Omni Shoreham Corporation. Inova Health Care Servs. for Inova Fairfax Hosp. & Its Dep't, Life with Cancer v. Omni Shoreham Corp. ("Inova VIII"), Civ. A. No. 20-784 (JDB), 2024 WL 5158796, at *19 n.14 (D.D.C. Dec. 18, 2024).  It turns out that supposition was an understatement. Plaintiffs now ask to recover from Omni $1,302,200.80 in legal fees.  For a host of reasons explained below, that amount of fees is unreasonable, and the Court instead awards Plaintiffs $743,184.54.  The large amount that Omni will have to pay and the remainder of the hefty fees that Plaintiffs will have to bear are—like the rest of this case—"a reminder that a client's best interest is not always served by uncompromising litigation." Id.

### BACKGROUND

"The labyrinthine docket record of this litigation need not detain us." Altman v. Cent. of Ga. Ry. Co., 580 F.2d 659, 660 (D.C. Cir. 1978).  Here's the short of it.  Inova Fairfax Hospital and its Department, Life with Cancer and Smith Center for Healing and the Arts (together,

"Plaintiffs") contracted with[1] Omni to host the September 2019 "Joan Hisaoka 'Make a Difference' Gala" (the "Gala"), an annual fundraiser for cancer organizations including Plaintiffs. Inova VIII, 2024 WL 5158796, at *1. The contract (the "Agreement") identified specific ballrooms in which the Gala was to be held. Id. Nonetheless, Omni informed Plaintiffs just over a month before the Gala that it was moving the event from the contracted-for ballrooms to other, less ideal ballrooms. Id. Omni, it turned out, had disregarded the preexisting Agreement and entered into an event contract with the Embassy of Lebanon for Plaintiffs' chosen ballrooms on the same date. Inova Health Care Servs. for Inova Fairfax Hosp. & Its Dep't, Life with Cancer v. Omni Shoreham Corp. ("Inova VI"), Civ. A. No. 20-784 (JDB), 2023 WL 5206142, at *2 (D.D.C. Aug. 14, 2023). Plaintiffs ultimately held the Gala at a different hotel as a result. Id.

So Plaintiffs sued, igniting what would become five years of litigation. See id. There have been four motions to dismiss, a motion to compel, dueling motions for summary judgment, a motion for reconsideration, two motions in limine, and more. Eventually, the Court granted Plaintiffs summary judgment on their claims for breach of contract and breach of the duty of good faith and fair dealing and denied Omni's counterclaim for breach of contract. Id. at *19. Then—after the parties yet again failed to settle—the issue of damages was put to a jury in a multi-day trial. See Inova VIII, 2024 WL 5158796, at *3. The jury awarded Plaintiffs $225,000.27 in damages, consisting of both additional costs and lost distributions. Id. Post-trial, the Court denied Omni's motions to dismiss and for a new trial, reduced Plaintiffs' damages by $21,898.17, and awarded Plaintiffs some costs. Id. at *19.

---

[1] Inova and Smith Center were parties to or beneficiaries of the relevant contract. See Inova VIII, 2024 WL 5158796, at *5 & n.4.

That leaves attorneys' fees and expenses, which Plaintiffs moved for on February 7, 2025. Their motion—which carries with it 339 pages of exhibits, including a supposed expert report—seeks $1,286,515.17. Mot. Att'ys Fees & Expenses [ECF No. 141 at 3-30] ("Mot.") at 27. After Omni filed a detailed opposition, see Def.'s Opp'n Fee Mot. [ECF No. 145] ("Opp'n"), Plaintiffs not only replied, but supplemented their motion with (1) another expert report and (2) a request for more than $85,000 in "fees on fees"—i.e., fees incurred in preparation of their attorneys' fees motion. See Pls.' Reply Fees Opp'n [ECF No. 147] ("Reply"). Omni responded by moving to strike those supplements. Def.'s Mot. Strike Suppl. Expert Rep. & Suppl. Request Att'y Fees & Expenses [ECF No. 149] ("Strike Mot.").

## ANALYSIS

Litigants in this country are generally "responsible for paying the costs and fees that their own attorneys incur during the course of litigation, a practice known as the 'American rule.'" Yeh v. Hnath, 294 A.3d 1081, 1087 (D.C. 2023).[2] But parties can contract around that default rule. James G. Davis Constr. Corp. v. HRGM Corp., 147 A.3d 332, 337 (D.C. 2016). The parties did so here. The Agreement provides that each party will "indemnify, defend and hold the other harmless from any loss, liability, cost or damages (including reasonable attorneys' fees and disbursements) arising from . . . [a]ny breach of this agreement by [a party] in the performance of its obligations under this agreement." Gala Agreement [ECF No. 141-1] at 8. Both parties recognize that this language requires Omni to pay Plaintiffs reasonable attorneys' fees and disbursements arising out of Omni's breach of contract. See Mot. at 13; Opp'n at 30;

---

[2] D.C. law controls the interpretation of, and thus the attorneys' fees award under, the Agreement. See Nepera Chem., Inc. v. Sea-Land Serv., Inc., 794 F.2d 688, 694–95 (D.C. Cir. 1986). Rightly, neither party contends that the "reasonable fee" standard under D.C. law is materially different than the standard federal courts frequently employ in determining reasonable fees under contracts and fee-shifting statutes alike. So the Court uses both federal and D.C. caselaw for the relevant standards. See Klayman v. Jud. Watch, Inc., Civ. A. No. 06-670 (GMH), 2022 WL 22263805 (D.D.C. Oct. 25, 2022), recommendation adopted by, Civ. A. No. 06-670 (CKK), 2023 WL 9209434 (D.D.C. May 3, 2023) (taking same approach).

see also James G. Davis Constr. Corp., 147 A.3d at 340 (holding that contract with similar language entitled non-breaching party to reasonable attorneys' fees).

As a result, it becomes the Court's job to determine "a reasonable fee award . . . in light of the relevant circumstances." Ideal Elec. Sec. Co. v. Int'l Fid. Ins. Co., 129 F.3d 143, 150 (D.C. Cir. 1997); Ginberg v. Tauber, 678 A.2d 543, 551 (D.C. 1996) (D.C. law provides that where, as here, "there is no agreement concerning how the amount of [attorneys'] fees is to be calculated," the trial court "determines the amount of the fee").  Notably, "[t]he party seeking fees bears the burden of establishing entitlement to [the requested] award." See Klayman v. Jud. Watch, Inc., Civ. A. No. 06-670 (GMH), 2022 WL 22263805, at *7 (D.D.C. Oct. 25, 2022), recommendation adopted by, Civ. A. No. 06-670 (CKK), 2023 WL 9209434 (D.D.C. May 3, 2023) (internal quotation marks omitted).

The question is thus whether Plaintiffs have met their burden of establishing they are entitled to more than $1.3 million in fees and expenses.  Omni says no, raising an armada of red flags that it argues reveal that the "Court should only award Plaintiffs a fraction of their requested fees."  Opp'n at 2.  The Court in large part agrees.  The documentation and attendant rationales that Plaintiffs put forward not only fail to satisfy their burden of establishing reasonableness but show that a large majority of their "fee request is not only . . . excessive," but "plagued with deficiencies."  Louise Trauma Ctr. LLC v. Wolf, Civ. A. No. 20-2348 (DLF), 2024 WL 4227617, at *3 (D.D.C. Sept. 18, 2024).  The Court will thus award Plaintiffs only one half of the sum they request for the time of their counsel ("Counsel").  The Court will, however, award Plaintiffs most of the expenses they request.

Before beginning, the Court notes that just last April it reminded the parties that "[a] request for attorney's fees should not result in a second major litigation."  Hensley v. Eckerhart,

461 U.S. 424, 437 (1983).  Yet considering they filed in conjunction with this fee request over

115 pages of briefing and over 415 pages of exhibits (including two purported expert reports), it

appears the parties did not take that reminder to heart.  Indeed, much of their briefing consists of

finger pointing and rehashing old debates about who is to blame for this litigious mess.  The

Court declines to involve itself in such school-yard skirmishes.  It will instead address only the

parties' substantive arguments.

## I.    Attorney Hours

The parties don't dispute that the word "reasonable" in the Agreement bears the same

meaning it does in attorney-fee caselaw from this Circuit and D.C. courts.  "In most situations, a

reasonable fee is computed by . . . determining the so-called lodestar": a court first determines

the reasonable rate, then determines the reasonable hours worked, multiplies those two figures

together, and makes adjustments as appropriate.  See Fed. Mktg. Co. v. Va. Impression Prods.

Co., 823 A.2d 513, 530 (D.C. 2003) (quoting Hampton Courts Tenants Ass'n v. D.C. Rental

Hous. Comm'n, 599 A.2d 1113, 1115 (D.C. 1991)); In re Donovan, 877 F.2d 982, 992 (D.C. Cir.

1989).  To help courts determine the lodestar, the D.C. Court of Appeals (along with many other

courts) has adopted twelve non-exhaustive factors that include, for example, "the time and labor

required" and "the amount involved and the results obtained."  See James G. Davis Constr.

Corp., 147 A.3d at 346–47; Frazier v. Franklin Inv. Co., 468 A.2d 1338, 1341 n.2 (D.C. 1983).[3]

---

[3] In full, these factors are:

(1) the time and labor required;
(2) the novelty and difficulty of the questions;
(3) the skill requisite to perform the legal service properly;
(4) the preclusion of other employment by the attorney due to acceptance of the case;
(5) the customary fee;
(6) whether the fee is fixed or contingent;
(7) time limitations imposed by the client or the circumstances;
(8) the amount involved and the results obtained;
(9) the experience, reputation, and ability of the attorneys;

"Not all of these potentially relevant factors are pertinent in every case, however," and a court need not analyze any, let alone all, of the factors in awarding attorneys' fees. See James G. Davis Constr. Corp., 147 A.3d at 346.

Here, Plaintiffs urge the Court to conclude the lodestar is virtually the same amount Counsel charged. The Court declines that request, because that amount is far from reasonable. A host of deficiencies discussed below plague Plaintiffs' billing. And these are compound errors that make it near impossible to untangle the reasonable hours from the unreasonable hours. So the Court will award Plaintiffs only half of the reimbursement they request for Counsel's time. See Role Models Am., Inc. v. Brownlee, 353 F.3d 962, 973 (D.C. Cir. 2004) ("A fixed reduction is appropriate given the large number of entries that suffer from one or more of the deficiencies."); Hensley, 461 U.S. at 436–37 (explaining that a court may use estimates in calculating and allocating an attorney's time and may "simply reduce the award to account for" overbilling); Louise Trauma Ctr. LLC v. U.S. Dep't of Homeland Sec., Civ A. No. 21-2371 (JDB), 2024 WL 3251225, at *8 (D.D.C. July 1, 2024).

### a. The Court will not consider the Mead reports.

Before getting to the lodestar analysis, the Court filters the sources it will consult in the process. Plaintiffs submit with their motion a report by Christopher B. Mead, a D.C. trial lawyer. See Expert Rep. Christopher B. Mead [ECF No. 141-15] ("Mead Rep."). Mead purports to act as an expert in attorneys' fees and explain why Plaintiffs' fee request is reasonable. See generally id. Plaintiffs also submitted a supplemental report by Mead with their reply, in which

---

(10) the "undesirability" of the case;
(11) the nature and length of the professional relationship with the client; and
(12) awards in similar cases.

Frazier, 468 A.2d at 1341 n.2.

Mead bats back Omni's opposition.  See Suppl. Expert Rep. Christopher B. Mead [ECF No. 147-1].  Omni takes issue with both reports.  It argues the Court should not consider them because (1) Plaintiffs are judicially estopped from filing an expert report on attorneys' fees and (2) Mead's reports are deficient in various respects.  See Opp'n at 11–14; Strike Mot. at 3–7.

Although not for the precise reasons Omni puts forward, the Court will not consider the reports.[4]

"The trial judge is considered an expert on the value of legal services."  Tyler v. Dixson, 57 A.2d 648, 649 (D.C. 1948); see Nat'l Treasury Emps. Union v. Nixon, 521 F.2d 317, 322 n.18 (D.C. Cir. 1975) ("A judge is presumed knowledgeable as to the fees charged by attorneys in general and as to the quality of legal work presented to him by particular attorneys.").  While parties are welcome to submit third-party expert reports with fee motions, the Court need not consider them if it deems them unnecessary or unhelpful.  Cf. Tyler, 57 A.2d at 649; Fed. R. Evid. 702 (explaining that expert testimony is admissible if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue").  So it's not surprising that it is uncommon in recent times for a court to rely on experts to determine attorneys' fees.

Here, Mead's reports provide nothing that aids or augments the Court's own expertise in reasonable attorneys' fees.  Even putting aside the facts that Mead does not purport to have any experience serving as an attorney-fee expert and that he consulted only documents provided by

---

[4] Omni's judicial estoppel argument fails.  It contends that Plaintiffs are estopped from submitting an expert report because, when Omni moved to reopen discovery and designate attorneys' fees experts, see Omni's Mot. Reopen Disc. & Designate Att'ys Fees Experts [ECF No. 88], Plaintiffs argued that attorneys' fees experts were not needed in this case, see Mem. Opp'n Def.'s Mot. Reopen Disc. & Designate Att'ys Fees Experts [ECF No. 90].  But the Court did not accept Plaintiffs' argument, as is necessary for judicial estoppel to apply.  See Moses v. Howard Univ. Hosp., 606 F.3d 789, 798 (D.C. Cir. 2010).  It instead denied Omni's motion because it was ill-timed—and stated that parties were free to submit expert reports on attorneys' fees when the proper time came.  See Draft Hr'g Tr. (Apr. 4, 2024) at 2:18–20, 9:13–16.

Plaintiffs, shortcomings abound.  As the Court will discuss, Mead's experience as a D.C. trial lawyer is not necessary to determine the relevant reasonable rates—the reason expert reports are generally used (if they are used at all).  See, e.g., Andrews v. Equinox Holdings, Inc., 570 F. Supp. 3d 803, 808 (N.D. Cal. 2021); Colo. Hosp. Servs. Inc. v. Owners Ins. Co., 154 F. Supp. 3d 1173, 1181 (D. Col. 2015).

And when it comes to the reasonableness of the hours expended, Mead's report is not built on his litigation experience.  It is largely a retelling of Plaintiffs' arguments as to the reasonableness of their litigation strategy, spiced with some summaries of the Court's own docket, caselaw, and flat conclusory statements.  See, e.g., Mead Rep. ¶ 29 ("It is my opinion that [Plaintiffs'] February 24 settlement offer was an almost desperate attempt by sophisticated clients to settle a meritorious lawsuit by severely discounting their claims."); id. ¶ 83 ("I reviewed Inova's motion in opposition to Omni's motion to reopen discovery and designate attorney fee experts . . . . The opposition is well written. The Court denied Omni's motion to reopen, vindicating the attorneys' judgment to oppose the motion."); id. ¶¶ 58–59 (describing his paralegal's research, which seems better suited for Plaintiffs' own motion for fees than an expert's report); id. ¶ 68 ("[C]ounsel spent roughly 25 hours analyzing damages, exchanging damages information with Omni counsel in unsuccessful settlement negotiations, and finalizing the complaint. Those hours appear reasonable for the tasks described."). The Court is confident in its own read of the docket and caselaw, as well as its own analysis of the parties' approach to this case and their time expended on it.

So the Court will not consider the Mead reports in calculating the reasonable attorneys' fees to which Plaintiffs are entitled.[5]

---

[5] Omni also moves to strike Mead's supplemental report.  See Strike Mot. at 1.  Because the Court will not consider the report, the Court denies that motion as moot.

**b. Reasonable Rates**

With that out of the way, the Court turns to determining Counsel's reasonable rates. Rates are reasonable when they are "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Covington v. District of Columbia, 57 F.3d 1101, 1109 (D.C. Cir. 1995) (quoting Blum v. Stenson, 465 U.S. 886, 896 n.11 (1984)). "[A]n attorney's usual billing rate is presumptively the reasonable rate." Baylor v. Mitchell Rubenstein & Assocs., P.C., 735 F. App'x 733, 735 (D.C. Cir. 2018) (internal quotation marks omitted) (quoting Baylor v. Mitchell Rubenstein & Assocs., P.C., 282 F. Supp. 3d 203, 210 (D.D.C. 2017)).

Counsel argues that the rates it charged Plaintiffs are reasonable because the rates are consistent with, if not below, the numbers on the Fitzpatrick Matrix.[6] See Mot. at 19. This is especially true, say Counsel, because it discounted by 20 percent its standard rates for Plaintiffs. See id. As has rarely been the case in this litigation, Omni agrees with Plaintiffs—at least when it comes to Plaintiffs' lawyers. See Opp'n at 16 ("Because Plaintiffs' counsels' hourly rates appear in line with market rates for D.C. litigators, Omni agrees to the use of the Fitzpatrick/USAO matrix as well as the presumptive reasonableness of the discounted hourly rates billed by opposing counsel."). The Court agrees as well and determines that the discounted hourly rates that Plaintiffs' attorneys charged are the applicable reasonable rates.

However, Omni disputes that the rates Counsel's paralegals charged were reasonable. Omni points out that Plaintiffs' paralegals' rates have consistently exceeded the Fitzpatrick

---

[6] The Fitzpatrick Matrix is a fee matrix that was promulgated by the D.C. United States Attorneys' Office. See Fitzpatrick Matrix [ECF No. 141-11]; J.T. v. District of Columbia, 652 F. Supp. 3d 11, 26 (D.D.C. 2023). The matrix sets an annual hourly rate for complex federal litigation based on an attorneys' years of experience. Plaintiffs do not explain why this contract dispute falls under the heading of complex federal litigation, but since Omni does not challenge the classification, the Court uses the Fitzpatrick Matrix as the benchmark. See Klayman, 2022 WL 22263805, at *19 (taking similar approach).

Matrix rates.  Opp'n at 16–17.  For example, in 2019, one paralegal's hourly rate was $275, <u>see</u> Shapiro, Lifschitz and Schram, P.C. Invoices [ECF No. 141-8] ("SLS Invoices") at 12, while the Fitzpatrick Matrix rate was $189, <u>see</u> Fitzpatrick Matrix [ECF No. 141-11].  Indeed, over the course of this litigation, Plaintiffs' paralegals' hourly rates were on average $82 higher than the Fitzpatrick Matrix rate.  Plaintiffs have provided no rationale for these higher-than-average rates. <u>See</u> Reply at 17 n.1 (framing the rates as "slightly above" the Matrix).  Rather, they simply assert that their across-the-board 20 percent reduction accounts for any unreasonable charges.  <u>Id.</u>  But the paralegals' rates were at times almost 50 percent higher than the Matrix rate, placing the overcharge outside of any cushion the 20 percent discount provides.  While the paralegals' cumulative 41.9 hours accounts for only a drop in Counsel's hour bucket, the Court will consider the overcharge in making its overall reduction to the lodestar.

### c. Reasonable Hours

With the reasonable rates largely determined, the Court moves to the other half of the lodestar calculation: the "determination of the number of hours reasonably expended."  <u>See</u> <u>Covington</u>, 57 F.3d at 1107.  Plaintiffs' burden here requires submission of "supporting documentation . . . of sufficient detail and probative value to enable the court to determine with a high degree of certainty that" the over 2,300 hours they seek to have reimbursed "were actually and reasonably expended."  <u>Role Models</u>, 353 F.3d at 970.  Plaintiffs claim that an affidavit of lead partner Christopher Mahoney and over 200 pages of invoices going back to 2019 do just that.  <u>See</u> Aff. of Christopher W. Mahoney [ECF No. 141-2]; SLS Invoices; Barclay Damon Invoices [ECF No. 141-10] ("BD Invoices").

In response, Omni points out a smattering of deficiencies in Plaintiffs' billing to show the hours for which Plaintiffs seek reimbursement are unreasonable.  <u>See</u> <u>Donnell v. United States</u>,

682 F.2d 240, 250 (D.C. Cir. 1982) ("The district court cannot inquire into the reasonableness of every action taken and every hour spent by counsel, and it will consider objections to filed hours only where it has been presented with a reasonable basis for believing the filing is excessive."). With a few exceptions, the Court agrees, and proceeds to walk through each of Omni's points of contention.

### i.  Lack of Detail

To begin, Omni argues that the billing entries of Mahoney—not only the lead partner on this case, but overwhelmingly the highest biller of hours—are insufficiently detailed.

"Attorneys who anticipate making a fee application must maintain contemporaneous, complete and standardized time records which accurately reflect the work done by each attorney." Nat'l Ass'n of Concerned Veterans v. Sec'y of Def., 675 F.2d 1319, 1327 (D.C. Cir. 1982).  When billing entries are "vague and contain no useful breakdown of professional time by task," a court is left with no "'basis to determine with a high degree of certainty that the hours billed were reasonable,' and thus cannot be charged" to the opposing party.  See Michigan v. EPA, 254 F.3d 1087, 1093 (D.C. Cir. 2001) (quoting In re Donovan, 877 F.2d at 995).  "Generic, one-line entries 'are inadequate to meet a fee applicant's heavy obligation to present well-documented claims.'"  Louise Trauma Ctr. LLC v. U.S. Dep't Homeland Sec., Civ A. No. 20-1128 (TNM), 2023 WL 3478479, at *6 (D.D.C. May 16, 2023) (quoting Role Models, 353 F.3d at 971).

Omni correctly asserts that Mahoney's timesheets are replete with nondescript entries. See Opp'n at 17–21.  For example, about 100 of Mahoney's time entries include simply "review correspondence," with no detail as to what correspondence or for what purpose it was being reviewed.  See, e.g., SLS Invoices at 19–20 (five "review correspondence" entries within a single

month).  And that's only the tip of the iceberg: Mahoney's entries contain far more instances of imprecise entries, such as "review pleadings" (25 entries), "research complaint" (10 entries), "research and prepare" a filing (48 entries), "prepare for trial" (18 entries), and countless instances of "review[ing]" various documents.  See In re Olson, 884 F.2d 1415, 1428 (D.C. Cir. 1989) (reducing fee where many entries "wholly fail[ed] to state, or to make any reference to the subject" of attorneys' work).  The issue with these vague entries is exacerbated by the fact that many identical entries appear day after day and month after month—the Court has no way of distinguishing whether the work done on one day was different from or duplicative of the work done on another day.  See, e.g., SLS Invoices at 25 (seven entries in a row of "research opposition to motion to dismiss," "research and prepare opposition to motion to dismiss," or "prepare opposition to motion to dismiss"); Role Models, 353 F.3d at 971 (taking issue with "identical one-line entr[ies]").

Plaintiffs respond by arguing that Mahoney's timesheets are sufficient because "[a] fee application need not present the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney." Segar v. Garland, Civ. A. No. 77-81 (EGS), 2024 WL 4332615, at *10 (D.D.C. Sept. 27, 2024) (quoting Nat'l Ass'n of Concerned Veterans, 675 F.2d at 1327); Reply at 10 (quoting Segar).  But in the very case Plaintiffs cite, the court recognized that entries such as "research reply brief," "trial prep," "document review," and "prepare for trial" "fall into the category of deficient entries." Id. (collecting cases).  In fact, the D.C. Circuit has held that some entries nearly identical to Mahoney's are inadequate.  See Michigan, 254 F.3d at 1094 ("review emails," "review and comment on fax," "review and respond to emails"); Role Models, 353 F.3d at 971 ("research and writing for appellate brief," "research," "writing").

Plaintiffs are right that a court does not expect a lawyer to describe the minutiae of the task he is performing each minute. But it does expect, "at the very least, the general subject of the substantive work the attorneys engaged in." <u>Segar</u>, 2024 WL 4332615, at *10. Mahoney was clearly capable of providing that simple detail; he did so on occasion. <u>See, e.g.</u>, SLS Invoices at 20 ("Review correspondence re settlement."); BD Invoices at 61 ("Review correspondence from C. Mead re engagement in support of motion for attorney's fees."). Yet many of Mahoney's entries lack even that—even though Mahoney knew for most, if not all, of the litigation that Plaintiffs would be seeking attorneys' fees, <u>see Nat'l Ass'n of Concerned Veterans</u>, 675 F.2d at 1327, and even though he was the lead counsel on the case, <u>see In re Olson</u>, 884 F.2d at 1428 (expressing concern that undetailed time records were "most prevalent among the lawyers billing at the highest rates"). Considering that (as explained below) Mahoney's hours far, far exceed those of any other person who billed on this case, the Court concludes that his lack of detail warrants a fairly substantial decrease in the lodestar.

### ii.  Block Billing

Omni next argues that the Court should "significantly reduce Plaintiffs' lodestar figure because of their attorneys' extensive use of block billing." Opp'n at 21.

Block billing is "a method of 'time-keeping'" by which a professional "enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks.'" <u>Cobell v. Norton</u>, 407 F. Supp. 2d 140, 159 (D.D.C. 2005) (quoting <u>Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.</u>, 82 F.3d 1533, 1554 n.15 (10th Cir. 1996)). These "lump[ed] together" time entries make it near "impossible to evaluate [each entry's] reasonableness." <u>Role Models</u>, 353 F.3d at 971. As a result, "block billing is disfavored in this jurisdiction." <u>Cobell v. Jewell</u>, 234 F. Supp. 3d 126, 173 (D.D.C. 2017).

Here, it's hard to find an entry that isn't block billed.[7]  No matter, say Plaintiffs, because the entries still contain "sufficient detail to evaluate what the lawyers were doing and the reasonableness of the number of hours spent."  Reply at 12.  They are right that some courts have declined to reduce the lodestar when block billing "was not unduly excessive" and the lumped-together entries did not contain "inadequate description[s]" of the work performed.  See, e.g., Smith v. District of Columbia, 466 F. Supp. 2d 151, 158 (D.D.C. 2006).  That is far from true here, however.  Counsel's timesheets are chock-full of blocked billing that conjoins nondescript entries: in some cases, entire months totaling over 100 hours contain only undetailed, block-billed entries.  See, e.g., BD Invoices at 34–35.  This combination of errors makes it impossible for the Court to determine whether Counsel reasonably expended the hours billed.

Consider the following entry by Mahoney: "Research and prepare Complaint against Omni Shoreham; conference with SHS re same; email to client."  SLS Invoices at 12.  For these tasks, Mahoney billed 6.5 hours.  Id.  How is the Court supposed to know if this was reasonable?  Did Mahoney spend multiple hours on an email?  If so, what was the email about?  Was it a complex issue that warranted substantial time?  Or were 6 of the 6.5 hours spent researching and preparing the complaint?  That could be reasonable—if only the Court knew what he was researching and preparing.

In short, Counsel's incessant block billing precludes the Court from "determin[ing] with a high degree of certainty" that the hours spent on this litigation were reasonable.  See In re Olson, 884 F.2d at 1429.  Of course, not every block-billed entry is so prohibitive, and the Court

---

[7] See, e.g., SLS Invoices at 7–8, 11–12, 14–17, 19–20, 22–23, 25, 27, 29, 32–45, 47–49, 51–54, 56–68, 60–63, 65–67, 69–70, 72–74, 76–78, 80–84, 86–87, 89, 98, 101, 103, 106, 107–109, 112, 118, 120, 122, 124, 126; BD Invoices at 5, 10–11, 21, 27–28, 34–35, 42–44, 50–54, 61–62, 68–69; see also Opp'n at 21–22.

can see that some of Counsel's time was reasonably spent.[8]  But the extensive blocking together of undetailed entries does not permit the Court to determine whether the amount of hours Plaintiffs submit is reasonable, and the Court will significantly decrease Plaintiffs' award for attorney hours accordingly.

### iii.  Hours Expended on Claims Against the Embassy and for Special Love

Compounding the issues of lack of detail and block billing is the fact that Plaintiffs did not succeed on every claim they originally brought.  Rather, they voluntarily dismissed claims (1) for tortious interference and civil conspiracy against the Embassy of Lebanon and (2) brought by former-plaintiff Special Love.  Omni argues that Plaintiffs' requested hours should be reduced to account for the time spent on these matters.  See Opp'n at 28–34.

While the parties spill much ink on whether Plaintiffs are a "prevailing party" when it comes to these claims, see, e.g., id. at 28–30, 32–33; Reply at 17–19, they also appear to acknowledge that what matters for these contractually-shifted fees is instead the language of the contract, see Opp'n at 28 n.6 (recognizing that "the [Agreement's] indemnification provision is not contingent on prevailing party status"); Reply at 17–18 (assessing the indemnification provision does not require prevailing party status on each claim).  The Agreement states that the "Indemnitor"—which the parties agree is Omni here—will indemnify the other party for "any . . . attorneys' fees and disbursements arising from . . . [a]ny breach of this agreement by the Indemnitor in the performance of its obligations under this agreement."  Gala Agreement at 8 ¶ 4

---

[8] See, e.g., BD Invoices at 68 (attorney G. Seador's entry for "[l]egal research regarding Rule 408 and whether a party's insertion of unconditional payment language circumvents Rule 408's inadmissibility of settlement discussions; summarize case law regarding same"); SLS Invoices at 87 (paralegal Moody's entry for "[p]repar[ing] copies of exhibits to Statement of Material Facts; proof of final exhibits"); id. at 51 (partner Schram's entry for "telephone with [client] regarding expert witness report draft and timing of [his] deposition; follow up with [Mahoney re same]").  Overall, block billing or no block billing, it appears everyone billed their time more specifically than Mahoney.  Unfortunately for Plaintiffs, Mahoney billed more than 90 percent of the hours in this litigation.

(cleaned up). So the question is whether the attorneys' fees for the claims against the Embassy and for Special Love arise from Omni's breach.

The phrase "arising from" "means to originate from a specified source" and thus "generally requires a causal connection, not merely a logical one." See N. Am. Butterfly Assoc. v. Wolf, 977 F.3d 1244, 1260 (D.C. Cir. 2020) (cleaned up); "Arise," Oxford English Dictionary (Oxford University Press) (accessed June 13, 2025), https://doi.org/10.1093/OED/1317526737 (Sense III.17: "To spring, originate, or result from . . . ." (emphasis in original)). As such, the phrase "sweeps less broadly than 'in connection with' or 'in relation to.'" N. Am. Butterfly Assoc., 977 F.3d at 1260 (quoting Azima v. RAK Inv. Auth., 926 F.3d 870, 878 (D.C. Cir. 2019)).

The Court agrees with Omni that the claims against the Embassy did not arise from Omni's breach of contract. See Opp'n at 30–31. In their amended complaint, Plaintiffs alleged that the "Embassy acted intentionally . . . to procure" Omni's breach "or to interfere with" Omni's performance of the Agreement and that the Embassy conspired for Omni to "repudiate and breach and/or not perform the" Agreement. Am. Compl. [ECF No. 26] ¶¶ 52, 55–57. These allegations show Plaintiffs' claims against the Embassy did not originate from Omni's breach but from the Embassy's own conduct that preceded—and indeed itself caused—Omni's eventual breach. In other words, while the claims against the Embassy may have been related to the Agreement, they arose independently of Omni's breach.

Plaintiffs do not meaningfully contest this conclusion. Instead, they emphasize that "the claims against the Embassy share[d] a common core of facts and underlying factual context, and [we]re all premised on Omni's" breach. Reply at 18. That may be relevant to assessing an attorneys' fees request under a statute that awards such fees to a "prevailing party." See Morgan

v. District of Columbia, 824 F.2d 1049, 1066 (D.C. Cir. 1987).  But it's not relevant to determining whether the Agreement's indemnity provision reaches these claims.  And all Plaintiffs have to say regarding the contractual language is that the argument that the claims against the Embassy "did not arise out of" but caused Omni's breach "is baseless."  Reply at 19. That does not move the needle—a needle Plaintiffs bear the burden of moving.

So the hours Plaintiffs expended on their claims against the Embassy are not recoverable and thus must be excluded from Plaintiffs' total hours.  Yet here the Court encounters the barriers erected by the undetailed entries and block billing: there's no way to determine exactly how many hours that is.  The Court knows that all the hours spent on the claims against the Embassy occurred before July 9, 2021, the date Plaintiffs dismissed those claims.  See Notice of Dismissal [ECF No. 60] at 1.  And there are some entries that speak directly to the Embassy: for instance, in August 2020, 10 out of Mahoney's 18 entries included researching the Foreign Sovereign Immunities Act, see SLS Invoices at 34–37, and in 2021, Mahoney logged time for settlement discussions with the Embassy and for responding to the Embassy's motion to dismiss, see, e.g., id. at 67, 73.

But the block billing makes it impossible to determine just how much time was spent on these activities.  See, e.g., id. at 77 (Mahoney's July 7, 2021 entry for 5.7 hours spent on "[p]repar[ing] for depositions . . . ; review[ing] correspondence; email[ing] [the] client and [ ] counsel for Embassy"); id. at 35 (Mahoney's August 20, 2020 entry for 4.1 hours spent on "[r]esearch[ing] and prepar[ing] discovery responses; email[ing] . . . client re same; conference with SHS re same; research[ing] Foreign Sovereign Immunities Act issues (re Lebanese Embassy)").  Adding to that, the countless nondescript entries such as "[r]esearch complaint" and "[r]eview pleadings," see, e.g., id. at 8, 32, obfuscate any time Counsel spent on, for

example, researching the complaint's claims against the Embassy or reviewing pleadings regarding the Embassy. Some of this time doubtlessly was spent on the claims against the Embassy.[9] Also notable is that no other lawyer and no paralegal ever made any entries specific to those claims. It is unlikely that none of them touched issues related to two of the complaint's five counts. But Counsel's endemic use of vague entries leaves the Court pretty much in the dark.

In sum, there is no way for the Court to ascertain how many of the hours Counsel billed prior to July 2021 were spent on the claims against the Embassy. The Court will thus add it to the list of errors on the basis of which to decrease the lodestar, taking into account that these claims comprised 40 percent of Plaintiffs' case prior to their dismissal.

The claims of Special Love, however, are a different story. Special Love brought the same claims as the other plaintiffs: that Omni breached the contract and the duty of good faith and fair dealing, and the Embassy helped to cause the breach. See generally Am. Compl. It would therefore appear that Special Love's claims against Omni "arose from" Omni's breach just like Plaintiffs' claims did. It is true that Omni protested Special Love's standing to bring its claims against Omni, arguing that the amended complaint failed to adequately allege Special Love was a beneficiary of the Agreement. See Inova Health Care Servs. for Inova Fairfax Hosp. v. Omni Shoreham Corp. ("Inova II"), Civ. A. No. 20-784 (JDB), 2021 WL 1405953, at *4 (D.D.C. Apr. 14, 2021). But the Court denied that argument twice over. See id. It may well be that Plaintiffs dismissed Special Love's claims because they thought they wouldn't be able to show Special Love had standing when push came to shove. The Court, however, doesn't have

---

[9] The Court agrees with Omni that the hours spent on the claims against the Embassy likely started before Plaintiffs' work on the amended complaint. See Opp'n at 32. Although the Embassy wasn't named as a defendant until Plaintiffs filed the amended complaint on December 17, 2020, the original complaint contained the tortious interference and civil conspiracy claims, except against "John Doe Organization." See Compl. [ECF No. 1-3 at 5] ¶¶ 45–53. So Plaintiffs were working on the claims from the outset.

facts to so conclude now, and it never decided the merits of Special Love's claims.    The information the Court does have best supports concluding that Special Love's claims arose from Omni's breach, and thus the Court will not reduce Plaintiffs' requested fee on this basis.

### iv.    Excessive Hours

Trudging onward, Omni argues that Plaintiffs' requested hours should be substantially reduced because Mahoney's hours were excessive for the work he performed.    Attorneys are entitled to compensation only for "reasonable" expenditures of time, and a court must "exclude hours that are excessive, redundant, or otherwise unnecessary."    Louise Trauma Ctr., 2023 WL 3478479, at *6.

From the outset, the total number of hours Mahoney billed on this litigation—over 1,900—hints at excessiveness.    To be fair, Mahoney did nearly all the work for Plaintiffs' case over five years (an issue the Court will discuss momentarily).    But even considering that he was working nearly alone, the amount of hours he spent on certain tasks was excessive.    Omni highlights that Mahoney billed 59 hours for researching and drafting the original complaint, 16 hours drafting discovery responses, and 47 hours (in just two weeks) for researching and writing a motion to dismiss opposition.    See Opp'n at 19–20; Decl. of C. Stephen Setliff [ECF No. 145-1] ("Setliff Decl.") at 8–9 (list of all Mahoney's "excessive hours" compiled by Omni).

Two things make these hours excessive.    First, this case was not all that complicated.    For most of the past five years, this litigation was simply a breach of a contract dispute between arms-length parties.    This was not litigation between scores of parties with scores of claims or that involved a complex statutory or regulatory scheme and implicated novel legal questions— despite the parties' constant attempts to treat it as such.    Second, Mahoney is a partner with more than three decades of experience.    As Omni points out, "[t]he primary reason for hiring

experienced attorneys like Mr. Mahoney who can bill higher rates is they are presumably able to accomplish things quicker based on [their] experience." Opp'n at 20. It may take an associate 60 hours to compile a 16-page breach of contract complaint, but one would not expect it to take a veteran litigator that long. Cf. Cabrera v. Mogoo, Inc., Civ. A. No. 22-1816 (MJS), 2025 WL 1341520, at *10 (D.D.C. May 8, 2025) (determining that 82 hours billed for work on three motions—including the replies and several related hearings—was reasonable). Similarly, it may be reasonable for a newer lawyer to spend nearly 2,000 hours on a breach of contract dispute over the course of five years, but Mahoney is not, nor does he profess to be, such a lawyer. See Decl. of Christopher W. Mahoney [ECF No. 141-2] ¶ 3.

Plaintiffs' only response to Omni's allegation of excessive hours is that the tasks on which Mahoney spent many hours were "critical" to their case. See Reply at 14–15 ("The time spent developing written discovery requests was critical to Inova's ultimate success on summary judgment."). But that an issue was material to plaintiffs' case does not make the number of hours spent on that issue inherently reasonable. The Court will reduce Plaintiffs' requested fee for excessive attorney hours accordingly.

### v. Work Done by Overqualified Professionals

Omni's next argument is that Counsel's hours were unreasonable because they had overqualified (and thus higher-billing) people doing work that either should have been delegated or that is unrecoverable.

### 1. Associate Work by Partners

First, Omni contends that partners were doing work appropriate for associates. Opp'n at 23–24. Ninety-five percent of the hours Counsel expended, Omni emphasizes, were recorded by partners; only one percent was billed by associates. Id. at 24. Omni argues that much of this

work—such as research, reviewing pleadings and other documents, preparing discovery, and drafting motions, briefs, and correspondence—should have been done by associates with lower hourly rates. See Setliff Decl. at 10–14 (compiling examples of work that should have been delegated and calculating total overcharge to be almost $290,000).

"[T]ime spent by high-priced senior lawyers on tasks that junior lawyers could have performed more economically, should be stricken from a 'reasonable' attorney's fee award." Brown v. Pro Football, Inc., 839 F. Supp. 905, 913 (D.D.C. 1993); Commodity Futures Trading Comm'n v. Trade Exch. Network Ltd., 159 F. Supp. 3d 5, 9 (D.D.C. 2015) ("Counsel requesting attorneys' fees may not charge an adversary lofty hourly rates for clerical or routine tasks conducted by senior-level attorneys."). This does not mean that every partner must delegate most or all work to associates; courts recognize that not all firms can "staff cases as deeply as big . . . firms do." Brown, 839 F. Supp. at 914. But a party can only recover the amount billed at a senior lawyer's higher rates if the time was spent on "matters demanding skilled expertise"; for time spent on other, less-complex matters, the party can only recover the amount that a less-skilled lawyer would've billed. Id.

Here, partners (and Mahoney specifically) did virtually all the work in this litigation and billed the same $625+ hourly rates regardless of the skill the task required. The tasks that Omni highlights are quintessential associate tasks that do not demand the expertise of lawyers with over 30 years of experience. See, e.g., SLS Invoices at 36 (Mahoney billing on August 27, 2020, for "[r]eview[ing] and analyz[ing] Omni's discovery responses" and "prepar[ing] discovery responses"); id. at 67 (Mahoney billing on April 30, 2021, for "[r]esearching motion to dismiss counterclaim"); id. 84–86 (Mahoney billing around 23 hours for "[r]eviewing deposition transcripts").

And although some amount of billing on these tasks may have been suitable for a partner, Mahoney's undetailed entries and block billing once again make any finding to that effect impossible.  Plaintiffs do not attempt to justify why, for example, Mahoney alone spent 60 hours researching and drafting a complaint, see, e.g., id. at 8, 11–12, when a lower-billing associate could have completed much of that work.  They merely frame the billing decisions as "a wise tactical decision" without explanation.  See Reply at 15.  Having a senior partner conduct most of the work on a case may be strategic—if it results in a more efficient use of time because of the partner's expertise.  But as the Court has explained, Mahoney did not always accomplish associate-level tasks in less time than an associate would.  So it's hard to see how the decision to have Mahoney take on the overwhelming majority of the work at his high billing rate was reasonable.

The Court will therefore decrease the lodestar to account for the overbilling that resulted from partners doing associate-level work.

### 2.  Paralegal Work by Lawyers

Second, Omni argues that lawyers billed for tasks suitable for paralegals.  Opp'n at 24–27; Setliff Decl. at 15–16 (compiling instances of attorneys doing work Omni argues should have been done by paralegals and estimating a nearly $23,000 overcharge).  These tasks include reviewing cover pages and summons, arranging translation services, correspondence, redacting documents for production, reviewing this District's mediation procedures, and compiling records.  Id.

"An attorney's fee award may . . . be adjusted downward if the attorney is seeking compensation for activities typically performed by a paralegal or law clerk."  Steven R. Perles, P.C. v. Kagy, Civ. A. No. 01-105 (AK), 2007 WL 9813124, at *13 (D.D.C. Nov. 14, 2007).  The

Court agrees with Omni that some of the tasks could have been completed by paralegals.  See, e.g., SLS Invoices at 56 (Mahoney's February 20, 2021 entry for "review[ing] rule 30(b)(6) deposition notices; telephone call with opposing counsel re same and re expert designations; telephone call with translator re translated complaint"); BD Invoices at 5 (Mahoney entry that includes "draft notice re mediation").  However, the Court does not agree that all the work in the handful of relevant block-billed entries is typically paralegal work, namely reviewing deposition transcripts, emailing or calling opposing counsel, and reviewing correspondence.  See Setliff Decl. at 15–16.  As a result, there were only a relatively small number of hours that were overbilled in this regard, and the Court thus concludes that these errors will not significantly impact the reduction in the reward for attorney hours.

### 3.  Nonrecoverable Clerical Work

Third, Omni contends that Counsel billed for unrecoverable clerical work.  See Opp'n at 27–28; Setliff Decl. at 17–18 (list of work Omni argues is clerical that adds up to more than $16,000 in overbilling).

"In general, a reasonable attorney fee includes compensation for the hours billed by paralegals, legal assistants, or law clerks at their market rates . . . but not for 'librarians, clerical personnel and other support staff,' whose work is assumed to be 'within the overhead component of a lawyer's fee.'"  Vining v. District of Columbia, 198 A.3d 738, 754 n.20 (D.C. 2018) (quoting Role Models, 353 F.3d at 974).  The Court again agrees that some, but not all, of the work Omni points to may be unrecoverable clerical work.  See, e.g., SLS Invoices at 38 (office manager Hubert's September 3, 2020 billing for "print[ing] and organiz[ing] documents"); id. at 36 (lawyer Halliburton's August 21, 2020 entry for "[c]reat[ing] folder in ShareFile for data repository; email to CWM with ShareFile link").  But most of it, such as proofreading and

correspondence, is work suitable for a paralegal.  See Vining, 198 A.3d at 754 n.20.  And even under Omni's telling, the billing for clerical work amounted to less than 20 hours.  So the Court acknowledges there was some overbilling for clerical work, but it accounts for only a very small fraction of the Court's overall reduction in Plaintiffs' award.

### vi.   Fees on Fees[10]

Omni's final objection to Counsel's hours is that Plaintiffs should not be able to recover any fees post-November 2024—i.e., fees incurred by Plaintiffs in filing their motion for fees, or "fees on fees."  See Opp'n at 34.  Omni's argument is not based on Plaintiff's lack of entitlement to such fees[11]—it's based instead on Plaintiffs' neglect to file with their motion for attorneys' fees any bills from December 2024 onward.  See id.  In response, Plaintiffs filed along with their reply their bills for December 2024 and January 2025, totaling $858 and $30,291.60, respectively.  See Suppl. Barclay Damon Invoices [ECF No. 147-2 at 18–32] ("Suppl. Invoices") at 1–15.  Omni then moved to strike these invoices and asked the Court to preclude Plaintiffs from seeking further fees and expenses.  Strike Mot. at 7–9.  Plaintiffs had all this information, Omni asserts, when they filed their motion for fees, and permitting them to augment that motion with more invoices prejudiced Omni by depriving it of the opportunity to respond.  See id.

The Court understands Omni's concerns: permitting a litigant to add in the last responsive pleading a bill he asserts is chargeable to his adversary creates a perverse incentive, especially when courts frequently rely on an opponent's critiques to weed out unreasonable fees.  See, e.g., Donnell, 682 F.2d at 250.  And while Plaintiffs justify their late filing of the January

---

[10] This discussion does not pertain to Plaintiffs' request for reimbursement for Mead's report.  The Court will discuss that below.

[11] The Court thus proceeds in accordance with the parties' apparent agreement that the Agreement provides for fees on fees.

invoice—the bill had not been finalized at the time they filed their motion—they do not even attempt to justify their late filing of the December invoice. See Reply at 20.

Simultaneously, however, the Court recognizes that litigants usually file requests for fees on fees after their motion for fees. See, e.g., Shaw v. District of Columbia, 253 F. Supp. 3d 267, 268 (D.D.C. 2017). Additionally, some of the invoices Plaintiffs originally filed with their motion covered their work on attorneys' fees. See, e.g., BD Invoices at 69. The Court will thus construe Plaintiffs' additional invoices as their application for fees on fees and add the December and January bills to Plaintiffs' total requested award—a requested award the Court will nonetheless greatly reduce. This addition and subsequent reduction are appropriate given that the late-added invoices suffer from some, if not all, of the defects as the earlier invoices.[12]

*    *    *

In short, Plaintiffs have failed to meet their burden of establishing that the full number of hours for which they request reimbursement is reasonable. Rather, their invoices are replete with errors that warrant a substantial decrease in their requested award.

### d. Final Lodestar

Let's take stock of the issues with Plaintiffs' fee request: the paralegal rates were unreasonable; the invoices were plagued with undetailed time entries, block billing, excessive hours, and mis-staffing; and the billed hours included time spent on claims against the Embassy of Lebanon. Considering this collection of compound errors, the Court will award Plaintiffs only 50 percent of the time Counsel billed. See Role Models, 353 F.3d at 973 ("In view of all this—

---

[12] This includes undetailed billings, see e.g., Suppl. Invoices at 6 ("Research re motion for fees and expenses"), block billing, see, e.g., id. ("Research/prepare motion for fees and expenses; review prior pleadings and defendant's requests for indemnification therein"), and a partner doing associate-level work, see, e.g., id. at 6–7 (no other professional besides Mahoney billing for month of January, doing tasks such as researching, drafting, and compiling documents, for a total of 51 hours). Additionally, a good portion of Mahoney's time was spent coordinating Mead's report—a report which, as the Court will soon discuss, was an unreasonable and unrecoverable expenditure. As a result, many of the December and January hours are unreasonable and are rightfully reduced with the rest of Plaintiffs' award.

inadequate documentation, failure to justify the number of hours sought, inconsistencies, and improper billing entries—we will allow reimbursement for only fifty percent of the [requested] attorney hours.").

This reduction is appropriate even considering the 20 percent across-the-board discount Counsel gave Plaintiffs.  Cf. Reply at 13, 17 n.1 (Plaintiffs contending that the discount makes up for any deficiencies in their fee request).  To start, there are more issues with the hours Counsel billed than warrant extensive discussion above: the timesheets are riddled with examples of seemingly duplicative entries,[13] as well as unexplained inconsistencies between different professionals' entries.[14]  This makes the Court all the more skeptical of the hours' reasonableness and warrants erring on the side of a greater reduction.

Moreover, Plaintiffs do not appear to have made any real attempt to exclude unreasonable hours from their fee request.  See Bd. of Trs. of Hotel & Rest. Emps. Local 25 v. JPR, Inc., 136 F.3d 794, 800 (D.C. Cir. 1998) ("Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary.") (quoting Hensley, 461 U.S. at 434).  Rather, outside of two invoices from around the time of the breach, Plaintiffs simply submitted every single bill from Counsel—defects and all—and barely addressed the bills' reasonableness in the motion.  That left it up to Omni and the Court to sift through the pages of invoices, which helped cause this avoidable second litigation.

---

[13] See, e.g., SLS Invoices at 14 (Mahoney billing 1.7 hours for "[r]eview[ing] correspondence; email to client; revis[ing] draft complaint and demand letter; conference with SHS re same; telephone call with client re same; email to Omni Shoreham" on both November 19, 2019 and November 20, 2019); id. at 19 (Mahoney billed 0.7 hours and 0.8 hours on January 6 and January 7, 2020, respectively, for the same four tasks).

[14] See, e.g., SLS Invoices at 14 (Mahoney billing for "conference with [Schram]" on November 20, 2019— a day that Schram did not bill anything); id. at 23 (same on February 24, 2020); id. at 36 (lawyer Halliburton billing for a call with Mahoney on a day Mahoney did not bill for any call).

This warrants reduction, as well.  See Goos v. Nat'l Assoc. of Realtors, 68 F.3d 1380, 1387 (D.C. Cir. 1995).

A 50 percent reduction—in addition to Counsel's discount—is also warranted because it results in an award more in line with the results obtained in this case.[15]  It's true that putting aside Plaintiffs' dismissed claims, Counsel obtained a favorable liability ruling on Plaintiffs' remaining claims.  When it came to damages, however, Counsel's victory was far from complete.  As amended, the jury awarded Plaintiffs $203,102.10.  See Order [ECF No. 137] at 1–2.  Counsel recognizes that this award amounts to "54% of the minimum amount [Plaintiffs] sought."  Reply at 3 (emphasis added).  But it is only 45% of the maximum amount they sought.  See Pls.' Pretrial Statement [ECF No. 104] at 11.  Plus, the Court denied Plaintiffs' post-trial request for prejudgment interest because Counsel failed to put the issue to the jury as required.  Inova VIII, 2024 WL 5158796, at *15–16.  And all of this was after years of pricey litigation driven by each side's tactics, including Counsel's settlement offers that failed in part because of the lofty attorneys' fees demanded.  See Opp'n at 3.  Given the only moderate success Counsel obtained for Plaintiffs, the Court finds an award of 50 percent of what was billed is reasonable.

So the Court will award Plaintiffs $503,856.26—half of the amount of fees they requested for attorney hours.

## II.    Expenses

The Court now briefly turns to the issue of expenses.  Plaintiffs request an award to cover (1) hard and soft costs Counsel charged them, (2) damages-expert David Paris's fee, and (3) Mead's fee.  Omni asserts that all three are unreasonable and unrecoverable.  The Court agrees only as to the third.

---

[15] The parties spent much of their briefing discussing proportionality.  See Mot. at 21; Opp'n at 5–10; Reply at 2.  What matters here is that "the amount involved and the results obtained" is a factor relevant to determining whether requested attorneys' fees are reasonable."  See Frazier, 468 A.2d at 1341 n.2.

### a. Hard and Soft Costs

Plaintiffs seek to recover the following as disbursements: "Lexis Nexis research; copying; long distance phone charges; Westlaw research; filing fees; PACER charges; litigation support technology; service of process; deposition transcripts; Uber charges; and local delivery charges." Mot. at 26.[16] This amounts to $74,438.59. <u>See</u> Setliff Decl. at 22; Suppl. Invoices at 8 (expenses charged in January 2025). Although not in its memorandum in opposition, Omni in its exhibits protests that these fees are unrecoverable because they "are considered law firm overhead and/or not typically passed on to clients." Setliff Decl. at 6 ¶ 25.

Fees that are not "normally billed to fee-paying clients" and are "part of routine office overhead" are not recoverable. <u>See</u> <u>Vining</u>, 198 A.3d at 752–53; <u>Pigford v. Vilsack</u>, 89 F. Supp. 3d 25, 36 (D.D.C. 2015). The Court concludes that Plaintiffs have carried their burden of showing that these costs do not fall into that category: they cite caselaw from this district that has said as much. <u>See</u> Reply at 20 n.3 (citing, <u>e.g.</u>, <u>Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Hotelco C.A.</u>, 342 F. Supp. 3d 1, 30–31 (D.D.C. 2018) (determining "airfare, lodging, meals, ground transportation, parking, postage and FedEx expenses, photocopier charges, legal research charges, PACER access charges, offsite telephone charges, e-discovery vendor charges, courier charges, [and] trial supply costs" are recoverable under contractual fee-shifting provision)). Considering Omni's offhand opposition cites no caselaw or facts to the contrary, the Court will award Plaintiffs these fees.

### b. Fees for Paris

---

[16] The Court already awarded Plaintiffs costs under Federal Rule of Civil Procedure 54(d), but "costs" under that rule only include a "limited" amount of what one may colloquially call costs: "Taxable costs are limited to relatively minor, incidental expenses as is evident from § 1920, which lists such items as clerk fees, court reporter fees, expenses for printing and witnesses, expenses for exemplification and copies, docket fees, and compensation of court-appointed experts." <u>Taniguchi v. Kan Pacific Saipan, Ltd.</u>, 566 U.S. 560, 573 (2012). So an additional award of costs is appropriate.

Plaintiffs also request $164,889.69 in fees it paid its damages expert, David Paris.  See Decl. of David N. Paris [ECF No. 141-16 at 2] ¶ 4; see also Bazarian Int'l Fin. Assocs., 342 F. Supp. 3d at 30–31 (explaining that expert fees are recoverable).  In contesting that request, Omni rehashes its objections to the reliability of Paris's testimony and its efficacy at trial.  See Opp'n at 35–36.  The Court has explained multiple times why these arguments don't show that Paris's testimony was unreliable or useless.  See Inova VIII, 2024 WL 5158796, at *2, *9–10.  And the Court does not agree that the fee is excessive, considering Paris was retained in 2020 and did significant work to support the litigation and settlement negotiations well before the 2024 trial. See Paris Invoices [ECF No 141-16 at 5] 1–32.  The Court will thus award Plaintiffs Paris's fee.

### c.  Fees for Mead

Lastly, Plaintiffs seek $55,160 in fees paid to Mead for his initial report.  See Schelter Ontario Mead & Sears Invoices [ECF No. 147-2 at 29] 1–3.  It will come as little surprise that the Court agrees with Omni that these fees were unreasonable.  As explained earlier, Mead's purported expert report largely regurgitated Plaintiffs' own arguments and provided no specialized knowledge that assisted the Court—itself the expert in attorneys' fees—in deciding whether the fees Plaintiffs request were reasonable.  Retaining Mead only resulted in duplicative work.  The Court thus will not award Plaintiffs Mead's fees.

## CONCLUSION

In the end, the Court awards Plaintiffs $743,184.54: $503,856.26 for reasonable hours, $74,438.59 for hard and soft costs, and $164,889.69 for Paris's fees.  This is both far less than what Plaintiffs requested and far more than Omni sought to pay.  That, however, seems like the appropriate balance to strike at what should be the actual end to this litigation before this Court. The past five years have yielded little benefit to either side because of both sides' tactics.  The

Court hopes this litigation—as well as this post-litigation attorneys' fees litigation—will teach the parties, their counsel, and posterity that fierce advocacy must be balanced with measured reasonableness.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated: <u>June 15, 2025</u>